# WILLIAM S. NORRIS *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 9, October Term, 1937.]

668

672

*Decided May 26th, 1937.*

The cause was argued, as of the April Term, before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, and SHEHAN, JJ.

*Charles G. Page,* for William S. Norris.

*Stewart Brown,* for Eleanor E. Smith.

*. R. E. Lee Marshall, City Solicitor,* and *Hector J. Ciotti, Assistant City Solicitor,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Maryland Legislature by chapter 513 of the Acts of 1914, codified as article 33, sections 222, 223, and 224, Code, authorized the election supervisors of Baltimore City, and the election supervisors of the several counties of Maryland, to use voting machines in primary and general elections under such rules and regulations as such supervisors might deem advisable or necessary. The supervisors for the city and for the counties respectively were also authorized to determine what election precincts should first be equipped with voting machines, and empowered to purchase such machines as they might deem advisable. Code (Supp. 1935) art. 33, sec. 224A.

By chapter 228 of the Acts of 1933 (Code [Supp. 1935] art. 33, sec. 224A), the election supervisors of Baltimore City were "directed" to use certain voting machines theretofore purchased by the Mayor and City Council of Baltimore "in all future elections." By chapter 532, sections 224B, 224C, and 224D, Acts of 1935 (Code [Supp. 1935] art. 33, secs. 224B, 224C, and 224D), the election supervisors of Montgomery County, with the approval of the board of county commissioners of that county, were authorized to secure and use in two of the election districts of that county similar machines.

These several statutes were obviously steps in an experiment which was being carried on to test the wisdom and the expediency of substituting voting by machine for the older system, formerly uniform throughout the state, of voting by paper ballots. Following the experience obtained from the operation of those laws, the Legislature, by chapter 94, Acts of 1937, directed (a) the board of election supervisors of Baltimore City in all future elections to use the voting machines theretofore purchased by the Mayor and City Council of Baltimore; and (b) authorized, directed, and empowered a board, composed of the members of the board of estimates and the board of election supervisors, "to purchase a sufficient number of voting machines for use in all polling places throughout the City of Baltimore at all pri-

mary, general, special and other elections, held or to be held in said City after the 1st day of January, 1938. The expenses incurred by said Board and the cost of such voting machines shall, upon the requisition of said Board, be audited by the Comptroller of Baltimore City, who shall pay the same by warrant drawn upon the proper officers of said City." Section 224A. Section 4, the concluding section of the act, provided: "That the Act is hereby declared to be an emergency law within the scope and meaning of Chapter 5 of the Laws of Maryland, Special Session 1936, and necessary as a police measure for the immediate regulation of elections in Baltimore City; and having been passed by 'yea' and 'nay' vote supported by three-fifths of all of the members elected to each of the two Houses of the General Assembly, the same shall take effect from the date of its passage." The act was approved and became effective on March 24th, 1937.

In obedience to the mandate of the act, the Mayor and City Council of Baltimore, by Ordinance No. 694, approved April 13th, 1937, authorized the Mayor and City Council of Baltimore to issue "negotiable or non-negotiable obligations" to an amount "not exceeding" $1,250,-000, to meet requisitions of the said board made under the authority and direction of chapter 94, Acts 1937.

On April 13th, 1937, William C. Norris, suing as a taxpayer of Baltimore City, filed in Circuit Court No. 2 of Baltimore City the bill of complaint in this case against the Mayor and City Council of Baltimore City, in which he prayed that Ordinance No. 694 be declared invalid, that chapter 94 of the Acts of 1937 be declared to be unconstitutional, and that the defendants be permanently enjoined from issuing obligations of the said city as provided by Ordinance No. 694. A demurrer to that bill was sustained and the bill dismissed. From that decree Norris, and one Eleanor E. Smith, an intervening plaintiff, appealed.

The grounds alleged as a basis for the relief sought by the appellants are: (1) That the act violates article

1, section 1, of the Maryland Constitution, which requires that all elections shall be by ballot; (2) that it is a special law passed for a case for which provision has been made by an existing general law; (3) that the emergency provision of the act violates the referendum article of the Maryland Constitution, article 16, section 2; (4) that the ordinance is void because it is an attempt to borrow money on the city's credit without a "prior enabling act or submission to the voters of the city," in violation of article 11, section 7, of the Maryland Constitution; and (5) that the ordinance is void because it fails to provide for the discharge of the debt authorized within forty years, as required by article 11, section 7, of the Maryland Constitution and section 25-B of the Charter of Baltimore City (Code Pub. Loc. Laws 1930, art. 4, sec. 25-B, as added by Laws 1936, 1st Sp. Sess., ch. 5).

The appellants assert the affirmative of those propositions, the appellee the negative.

Since the validity of the act in no wise depends upon the validity of the ordinance, while the validity of the ordinance does depend upon the validity of the act, the objections to the act will be considered first, and in the order in which they have been named.

*Election by ballot.*

Much interesting and useful learning has been invoked in aid of the contention that voting by machine in public elections is prohibited as a substitute for voting by ballot by the Constitution of Maryland, art. 1, sec. 1, but in the main the argument ignores the rule which above all others gives life to the written law and makes its use possible for the government and control of men in carrying on the actual business of life, and that is that, while the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee. 6 *R. C. L., "Constitutional Law,"* sec. 40. So it has been said that "a constitution

is to be interpreted by the spirit which vivifies, and not by the letter which killeth." *Ibid.* Nevertheless it is axiomatic that, where the language of a constitution is clear and unambiguous, there can be no resort to construction to attribute to the founders a purpose or intent not manifest in its letter. *Cooley on Constitutional Limitations* 124 *et seq.* But where the meaning of the words employed is susceptible of expansion so as to include a significance in complete harmony with the spirit and purpose of the instrument, which will gratify a legislative intent or serve a present need, they may be so interpreted, for it is an accepted canon of constitutional construction that such instruments are to be liberally construed to accomplish the purpose for which they were adopted. In determining the true meaning of the language used, the courts may consider the mischief at which the provision was aimed, the remedy, the temper and spirit of the people at the time it was framed, the common usage well known to the people, and the history of the growth or evolution of the particular provision under consideration. Since constitutions are the basic and organic law, and are meant to be known and understood by all the people, the words used should be given the meaning which would be given to them in common and ordinary usage by the average man in interpreting them in relation to every day affairs. 6 *R. C. L.*, *"Constitutional Law,"* chapter V; *Cooley on Const. Lim.* ch. IV; 12 *C. J.*, *"Constitutional Law,"* secs. 41-48. In aid of an inquiry into the true meaning of the language used, weight may also be given to long continued contemporaneous construction by officials charged with the administration of the government, and especially by the Legislature. 6 *R. C. L.* 62, 63.

In approaching the specific question under consideration, the first inquiry therefore is whether the word "ballot," as used in that part of article 1, section 1, of the Maryland Constitution, which provides that "All elections shall be by ballot," has such a common, definite, and precise meaning as to preclude any interpretation

of it which would permit any method of voting other than by some paper on which is indicated by appropriate marks the voter's choice of men or measures.

The word is derived from "ballotta," "a round bullet, a voice or lot (*Florio*, 1598), dim. of balla Ball," *Oxford Dictionary*, and is said in the same work to mean, "The method or system of secret voting, originally by means of small balls placed in an urn or box; an application of this mode of voting, * * *" and "to vote, for approval, selection or rejection, upon (a proposed resolution, candidate etc.), by depositing small balls in an urn or box, or by some other secret method," "To give a secret vote." In *Webster's New International Dictionary* it is defined as an, 'Act of voting, usually in secret, by balls or by written or printed tickets or slips of paper; the system of voting by balls or tickets, or by any device for casting or recording votes as by a voting machine." Wherever voting has been permitted as a political privilege or right, the secrecy of the vote has been found to be essential to a fair and free expression of the will of the voters. The dicast in Greece voted secretly by the use of balls, stones, or shells, and from the use of marked shells (*ostrakon*, Gr., a shell) in popular voting came the word "ostracism" or secret vote of the people. So too the Romans used a system of secret voting by means of *tabellae,* or tickets, of wood distributed to the citizens, *Middleton's Cicero* I, 2, 153; *New International Encyclopedia,* "*Ballot.*" Later, mechanical counters replaced the balls, and from time to time improvements were found which made possible the production of the modern machine in current use, which is designed to register each vote as it is cast, to automatically count and register the total count for each candidate or measure, to prevent fraud and to insure secrecy. They were in use in Lockport, N. Y., as early as 1892, and from that time the use has grown until at the presidential election of 1928 more than sixteen per cent. of the total vote is said to have been cast on voting machines.

The earliest voting in this state was *viva voce.* Article

2 of the Constitution of 1776 provided that all freemen having a freehold of fifty acres, or property above the value of thirty pounds, and otherwise qualified, should have the right of suffrage, in the election of the House of Delegates, and should on the day of election assemble at the court house in their respective counties, and elect *viva voce* delegates for their respective counties. Article 14 made similar provisions for the election of senatorial delegates, who, by article 15, were required to meet at Annapolis and elect "by ballot" fifteen senators. Article 25 provided for the election of a Governor by the "joint ballot" of both Houses. By an amendment proposed by chapter 115, Acts 1798, the constitutional provisions relating to the "judges, time, place, and manner of holding elections" were repealed, and those matters left to be "regulated by law." By an amendment proposed by chapter 83 of the Acts of 1809, suffrage was extended to all free, white, male citizens, and every such citizen given the right to "vote by ballot" for the election of public officers. By an amendment proposed by chapter 197 of the Acts of 1836, the power to regulate all matters relating to the judges, time, place, and manner of holding elections for Governor was committed to the Legislature. In the Constitution of 1851, article 1, section 1, appears the provision that at all elections "the vote shall be taken by ballot," which was retained in the Constitutions of 1864 and 1867, unchanged except for some trifling difference in phraseology.

It seems reasonably clear from that history of the evolution of the word "ballot" that it has no meaning or connotation so definite and fixed as to prevent its extension to include voting machines. It has successively been used to describe voting by means of balls, by slips of wood covered with wax, by paper ballots, by a machine which deposited balls, and by a machine which merely registered the vote. In the Constitution of 1776, it was used to describe a method of voting for the selection of certain officials by electors which permitted a degree of

secrecy not possible under the *viva voce* system provided for the election of the delegates or electors.

When the phrase "elect by ballot" was used in the Constitution of 1776 in providing for the election of senators by electors, it was used to describe a secret method of voting as contrasted with the open or *viva voce* system provided for the election of the delegates, and when it, or similar phrases, are used in the later Constitutions, the word "ballot" is obviously used in the same sense. The essential and desirable characteristic of voting by ballot was the prevention of fraud, intimidation, or duress, by insuring a degree of secrecy that would permit none but the voter to know how he voted.

The only system of voting by ballot then known was that by which the voter signified his choice of men or measures by depositing in some appropriate receptacle a ball, a piece of wood, as a token of his choice, or a piece of paper on which by suitable marks he had indicated that choice. The reason for selecting that system was to secure a degree of secrecy which was not possible under any system of *viva voce* voting, and its purpose was to free the voter from improper influences which might prevent the free and honest exercise of his right of suffrage. It is unbelievable that men of ordinary intelligence meant by the use of that phrase to prevent the use of improvements in the system which would promote the very objects and purposes which they had in mind, or that they attached any importance to the mere physical character of the means used to record the voter's choice. The phrase was used generally to describe any system of voting which insured secrecy to the voter in recording his choice, rather than specifically to describe any peculiar or particular method of accomplishing that result. It cannot be assumed that the framers of the several constitutions in which the phrase occurs meant that it should ever be so interpreted as to defeat the objects of the provisions in which it occurs, and to encourage the evils it was intended to prevent.

The expression occurs not infrequently in the consti-

tutions of American states, and, since the introduction of the voting machine as a practical and satisfactory means of voting at public elections, the courts have been called on in a number of cases to decide the very question under consideration here, and their conclusions have almost uniformly been in favor of the interpretation that voting by means of a voting machine is voting by ballot. *Nichols v. Minton* (1907) 196 Mass. 410, 82 N. E. 50, is to the contrary. That decision has been sharply criticized (124 Am. St. Rep. 573), but the court there was applying a constitutional provision that officers should be elected by "written votes," that the town clerk should "sort and count the votes" and make a "fair record of the same," which are so particular and specific that their analogy to the phrase "vote by ballot" is too remote to aid in the interpretation of the latter expression. The cases relating to the question are gathered in a note to *State v. Green* (Ohio 1929) 66 A. L. R. 849. Support for the interpretation that voting by means of voting machines is but another method of voting by ballot is also found in the fact that the Legislature of this State, at three separate sessions, has so interpreted it. Chapter 513, Acts 1914; chapter 228, Acts 1933; chapter 94, Acts 1935. Attention is also called to the manner in which the word "ballot" is used in article 16 of the Constitution of this State, which provides that laws submitted for a referendum under that article shall be submitted "on the ballots" (section 5) if containing less than two hundred words, but that if containing more than two hundred words, the full text shall not be "printed on the official ballots," etc. Section 5. An examination of the context of those phrases, however, discloses that the word "ballot" was there used in no narrower sense than that given it here. Where a law is too long to be conveniently stated on the ballot, constructive notice of it is to be given the voters by publication, and only the ballot title need appear on the ballot. The word "ballot" there was obviously used as it is used elsewhere in the Constitution, to include any system or method of voting under which the

voter could record his will accurately and secretly. In the section the word is treated as equivalent to "vote" and some indication that it was intended to be so interpreted is found in the fact that the Legislature, at the same session in which that amendment was proposed, declared that "all elections held through the medium of Voting Machines shall have the same validity in law as elections held by means of paper ballots." Section 2, chapter 513, Acts 1914; chapter 673, Acts 1914.

*Special Law.*

Another objection is that the act is a special law and therefore obnoxious to article 3, section 33, of the Constitution of Maryland. The appellee, in reply to that contention, says that the statute is a public local law, and for that reason is not a "special law" within the meaning of that provision. *Mayor etc. of Crisfield v. Chesapeake & Pot. Tel. Co.*, 131 Md. 444, 102 A. 751. But the premise that it is a local law cannot be sustained.

While it is difficult to formulate a comprehensive definition of the distinction between a public local law and a public general law, it may be said that a "public local law" is a statute dealing with some matter of governmental administration peculiarly local in character, in which persons outside of that locality have no direct interest, and a "public general law" is one which deals with a subject in which all the citizens of the state are interested alike, and the fact that it permits or directs differences in matters of mere administrative detail suited to the peculiar needs of localities does not make it any the less a public general law. 25 *R. C. L., "Statutes,"* secs. 65, 66; *Mathews v. City of Chicago*, 342 Ill. 120, 174 N. E. 35, 39; 59 *C. J., "Statutes,"* sec. 318; *Stephensen v. Wood*, 119 Tex. 564, 34 S. W. (2nd) 246, 248; *Williams v. People*, 24 N. Y. 405; *Healey v. Dudley*, 5 Lans. (N. Y.) 115.

The statute under consideration here is a public local law only in the sense that it operates in Baltimore City. It deals, however, with a subject on which that municipality is without power to legislate (Baltimore City Charter; article 11A, Constitution of Maryland), and is general in

the sense that, although it is only effective within a limited area, it regulates the manner in which citizens of the state residing in that area may exercise rights which affect the citizens of the whole state; for, while it applies only to elections held in Baltimore, the result of elections held there may determine what persons are to administer the government of the state, what laws are to regulate the conduct of its inhabitants, who are to represent it in the national senate, and who is to serve as the chief executive of the nation. It is not therefore a public local law within the meaning of the term "local laws" as used in Md. Const., art. 11A.

The question, therefore, is whether apart from its character as a public general or a public local law, it is a special law, within the meaning of that part of article 3, section 33, Constitution of Maryland, which provides that the General Assembly shall pass no "special law for any case for which provision has been made by an existing general law." That particular provision has been considered by this court in a number of cases, and while, as stated in *Williams v. Baltimore*, 289 U. S. 36, 53 S. Ct. 431, 434, 77 L. Ed. 1015, there "has been need, now and again, to develop close distinctions," the term "special law" has in them uniformly been interpreted to mean a special law for a special case.

In *Montague v. State*, 54 Md. 481, 489, one of the earlier cases, it is said: "The provision immediately following in the same section, that 'the General Assembly shall pass no special law for any case for which provision has been made by an existing general law,' has been construed as intended to prevent special legislation in special cases, (*McGrath v. State*, 46 Md. 631,) and we think it very clear from the enumeration made that the object of the preceding provisions was to prevent or restrict the passage of special, or what are more commonly called private acts, for the relief of particular named parties, or providing for individual cases. In former times, as is well known and as the statute books disclose, acts were frequently passed for the relief of named individuals,

such as sureties upon official bonds, sheriffs, clerks, registers, collectors and other public officers, releasing them sometimes absolutely, and sometimes conditionally from their debts and obligations to the State. The particular provision now invoked was aimed against the abuses growing out of such legislation, and its object was to restrain the passage of such acts, and to prevent the release of debts and obligations in particular cases, and in favor of particular individuals unless recommended by the Governor or the Treasury officials."

Obviously its purpose was not to impose such an intolerable limitation upon the power of the Legislature to pass general laws as to require that such laws be absolutely uniform in their operation throughout the whole territory affected, regardless of the needs and convenience of persons residing in different localities within that territory. So it appears to be well settled that a law intended to serve a particular need, to meet some special evil, or to promote some public interest, for which the general law is inadequate, is not a special law within the meaning of that term as used in that section of the Constitution. 59 *C. J. "Statutes,"* sec. 318, 258, note 8; 6 *R. C. L.* 420; *Grossfeld v. Baughman,* 148 Md. 330, 339, 129 A. 370; *Baltimore v. United Rys. Co.,* 126 Md. 39, 54, 94 A. 378; *O'Brian v. County Commrs.* 51 Md. 15, 23; *Lankford v. Somerset County,* 73 Md. 105, 117, 20 A. 1017, 1020, 22 A. 412.

In the case last cited, the court, in stating that principle, said:

"It is very clear that the Act under consideration is not a local or special Act for any of the particular inhibited cases enumerated in the constitution; nor is it a special law for any case for which provision has been made by existing general law. It is not in any sense a special law for any case.

"The Act under consideration purports to be a general law, and is amendatory of the general law of the State, passed to regulate the appointment of judges of election, the time, place, and manner of holding elections,

and of making returns thereof. The provisions of the Act are restricted, in their application, to about three-fourths of the State; the remainder of the State being subject to the pre-existing law for the regulation of elections.

"The constitutional provision (Const. art. 3, sec. 49), conferring upon the Legislature power to pass laws to regulate elections in the State, does not require that such laws should be uniform through the State. They must be free and equal to all persons entitled to vote; but there is nothing in the Constitution to require the modal proceeding to be the same in every part and section of the State. To the Legislature it confided the power to pass laws to regulate the subject-matter of holding and conducting elections; and while it may be a subject of regret that the provisions of the statute under consideration were not given application to the entire State, the exception of the nine counties from their operation does not subject the Act to any such constitutional objection as will invalidate it. No voter is hindered or prejudiced in his right to vote, by the mere difference in the method of conducting the election under the new law from that under the pre-existing law. The object of both laws is the same, the difference consisting only in the form and method of proceeding.

"Whether the act of 1890 (chapter 538) be regarded as a general or as a public local law would seem to be quite immaterial, though, according to decided cases, it may be regarded as a general law, as distinguished from a mere local law."

The Public General Laws of the State undoubtedly do provide for the time, the place, and the manner of holding elections in this state. Code (Supp. 1935) art. 33. But while those laws are general in their nature, they are by no means uniform in their regulation of the conduct of such elections in the several political subdivisions of the state. For instance, they provide that the polls shall open and close at certain hours in Baltimore City, and at different hours in certain of the counties (Code

[Supp. 1935] art. 33, sec. 69) ; they provide rates of compensation for election officials, varying in the several political subdivisions of the state; in some of such subdivisions notice of registration must be given by hand bills as well as by publication in a newspaper, in others publication by a newspaper is sufficient (Code, art. 33, sec. 15, as amended by Laws 1927, ch. 213; Acts 1922, ch. 76) ; in some counties the sheriff is required to detail deputies to preserve order at places where officers of registration may be sitting, in another he is forbidden to do so (Code 1924, art. 33, sec. 16; Acts 1924, ch. 538). Each of these instances constitutes an exception to a general regulation applying to all parts of the state not within the exception, but it has never been supposed that they were special laws within the meaning of section 33, article 3, of the Maryland Constitution, but they have been regarded as merely adjustments of the general law to the convenience and requirements of the voters in those parts of the state to which they apply.

Since the statute under consideration in this case does no more than provide a method of voting in Baltimore City, which in the judgment of the Legislature is peculiarly adapted to the needs of that particular locality, and, because of conditions there, is more likely to prevent fraud and insure secrecy in voting than the method provided for other parts of the state, it is not a special law, but merely an adaptation of the general law to the needs and conditions of a particular locality. For "while a statute which is applicable to all of the people of the state and which operates in all of the state is general in its character, it is not necessary that a law, in order to be general, shall affect all of the people of the state, or all of the state, nor need it include all classes of individuals; it may be intended to operate over a limited number of persons or things, or within a limited territory, and if every person or locality brought within the relations and circumstances provided by the law is affected, the law may be general although presently operative on but a single individual, or thing, place, or political

subdivision, such as a county or municipal corporation, and its general character is not affected by the number of persons, things, or localities which come within the scope of its operation." 59 *C. J.* 730.

3. *Emergency.*

The final objection to the act is that the declaration, in section 4 thereof, that it is an "emergency law," is invalid, because the Legislature failed to declare that it was "necessary for the immediate preservation of the public health or safety," as required by article 16, section 2, Maryland Constitution. The Legislature alone has the power to determine whether such an emergency as is contemplated by that section of the Constitution exists (*Culp v. Commissioners of Chestertown,* 154 Md. 620, 623, 141 A. 410), and its determination of that question is not judicially reviewable. *Ibid.* The language of section 4 is: "That this Act is hereby declared to be an emergency law within the scope and meaning of Chapter 5 of the Laws of Maryland, Special Session 1936, and necessary as a police measure for the immediate regulation of elections in Baltimore City; and having been passed by 'yea' and 'nay' vote supported by three-fifths of all of the members elected to each of the two Houses of the General Assembly, the same shall take effect from the date of its passage." The "emergency" referred to in Acts 1936, 1st Sp. Sess., ch. 5, arises from the "necessity of maintaining the police or preserving the health, safety, and sanitary condition" of the City of Baltimore. Section 4, chapter 94, Acts 1937, not only declares that act to be an emergency act within the meaning of chapter 5, Acts 1936, 1st Sp. Sess., but declares it to be necessary as a police measure for the immediate regulation of elections in Baltimore City. It further declares that it was passed by "yea and nay" vote supported by three-fifths of the members of each House, and that it should take effect from the date of its passage. In declaring the act to be an emergency law within the meaning of chapter 5, Acts 1936, 1st Sp. Sess., the Legislature necessarily meant that it was necessary to maintain the

"police" or to preserve the "health, safety and sanitary condition of the City," and it stated in terms that it was necessary as a "police measure" for the regulation of elections in Baltimore City. In *Bouvier's Law Diction-ary* it is said: "The word police has three significations. The first relates to the measures which are adopted to keep order, the laws and ordinances on cleanliness, health, the markets, etc. The second has for its object to procure to the authorities the means of detecting even the smallest attempts to commit crime, in order that the guilty may be arrested before their plans are carried into execution and delivered over to the justice of the country. The third comprehends the laws, ordi-nances, and other measures which require the citizens to exercise their rights in a particular form." See, also, 49 *C. J.* 1070; *State v. Frazier*, 39 N. D. 430, 167 N. W. 510, 515. In declaring that chapter 94 was a "police measure," necessary for the "immediate regulation of elections," and by adopting the language of chapter 5, Acts 1936, 1st Spec. Sess., that it was necessary to main-tain the police or to preserve the safety of the city, the Legislature declared in effect that the regulation of elec-tions in Baltimore City was a police measure necessary to protect the safety of the inhabitants of that city. It is true that the act (chapter 94, Acts 1937) does not liter-ally follow the language of the Constitution, but it is also apparent that it declares the existence of every ele-ment necessary to the exercise of the power conferred by article 16, section 2, Maryland Constitution, unless we are to restrict the meaning of the terms "maintaining the police" and "police measure" to the uniformed police. There are, however, two objections to so narrow an interpretation: (1) That every reasonable intendment is to be made in favor of the constitutionality of a statute, 12 *C. J., "Constitutional Law,"* sec. 221, note 19, sec. 222, note 23; (2) that it may not be presumed that the people who adopted the Constitution intended to give to the word "safety" so narrow a meaning as to prevent

its application to a police measure regulating the mode of voting at elections.

It is, unfortunately, a matter of common knowledge that there are few more fruitful sources of disorder, violence, and fraud than elections, unless protected by adequate regulations, rigidly enforced.

Scharf, in his *Chronicles of Baltimore*, referring to the year 1879, says: "Heretofore the citizens had witnessed much confusion and turbulence by the multitudes of people assembled at elections for the town and county. The Legislature therefore changed the constitution in this respect, by dividing both into districts, the wards of the city serving for districts; two years after, the manner of voting was limited to ballots, instead of voice, and these seasons ceased to be riotous as they had been." Again the same author, on page 549, referring apparently to 1856, says that: "Baltimore was again disgraced by another such scene of violence and blood, which occurred on Wednesday, the 8th of October, being the election for Mayor and City Council, when Mr. Thomas Swann was elected Mayor by 1575 majority over Mr. Robert G. Wright. About 12 o'clock a desperate struggle took place between the 'Rip-Rap' Club and the New Market Fire Company in the Lexington Market, which was a bloody and protracted battle. The firing was as regular as if it were by platoons. A great many persons were wounded and carried from the ground, and the drug shops near the scene of action were filled with the wounded and dying. The New Market Company were driven from the market-house and dispersed. Their engine-house was entered by the 'Rip-Raps' and found deserted, which they sacked. Disturbances broke out in various parts of the city, but none equalled that which we have mentioned."

Honest and free elections are the very basis of our system of government and essential to its continued existence. Whatever threatens them must also shake the foundations of that system. Of necessity therefore the power to protect them must fall within the police power

of the state, and the references to "maintaining the police," and "police measure" occurring in these two statutes must refer to that broader power, and not to the mere agencies by which measures adopted under its authority are administered, such as the uniformed police.

There is therefore no difficulty in reaching the conclusions that chapter 94 of the Acts of 1937 is an emergency statute within the meaning of article 16, section 2, of the Maryland Constitution.

*The Ordinance.*

In approaching the objections to the ordinance, consideration must be given to the fact that since chapter 94 of the Acts of 1937 is a valid enactment, the State, acting through the Legislature, and within its constitutional powers, has issued its mandate to the Mayor and City Council of Baltimore to secure, install, and use voting machines at future elections in that city.

The objection that the ordinance is invalid because it is an attempt to borrow money without an enabling act and without submitting the question to the voters of the city, as required by article 11, sec. 7, Md. Const., presents a narrow question, not free from difficulty.

That section in part provides: "From and after the adoption of this Constitution, no debt (except as hereinafter excepted), shall be created by the Mayor and City Council of Baltimore, * * * unless such debt or credit be authorized by an Act of the General Assembly of Maryland, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the City of Baltimore, at such time and place as may be fixed by said ordinance, and approved by a majority of the votes cast at such time and place; such ordinance shall provide for the discharge of any such debt or credit within the period of forty (40) years from the time of contracting the same; but the Mayor and City Council may, temporarily, borrow any amount of money to meet any deficiency in the City Treasury, and may borrow any amount at any time to provide for any emergency arising from the necessity of maintaining the police, or

preserving the health, safety and sanitary condition of the city."

The undoubted purpose of Ordinance No. 694 is to authorize the Mayor and City Council of Baltimore to create a debt without first submitting the question of the approval of such debt to the voters of Baltimore City, and is within the prohibition contained in the first sentence of section 7. It must therefore be invalid unless it falls within the proviso that "the Mayor and City Council may, temporarily, borrow any amount of money to meet any deficiency in the City Treasury, and may borrow any amount at any time to provide for any emergency arising from the necessity of maintaining the police, or preserving the health, safety and sanitary conditions of the city." The natural and ordinary interpretation of the words "deficiency in the city treasury" would be the lack of funds needed to perform some imperative and peremptory function of government. By section 224A of chapter 94, Acts 1937, the Mayor and City Council of Baltimore, through the agency of a special board, is directed "to purchase a sufficient number of voting machines for use in all polling places throughout the City of Baltimore at all primary, general, special and other elections, held or to be held in said City after the 1st day of January, 1938. The expenses incurred by said Board and the cost of such voting machines shall, upon the requisition of said Board, be audited by the Comptroller of Baltimore City, who shall pay the same by warrant drawn upon the proper officers of said City." Section 4 of that act states that it is an emergency measure within the meaning of chapter 5 of the Acts of 1936, 1st Sp. Sess., and necessary as a police measure for the immediate regulation of elections. The Mayor and City Council was therefore confronted with the immediate necessity of raising funds to comply with the legislative mandate. It may be presumed that, since its fiscal year had begun before the act became effective, Baltimore City Charter (Ed. 1927) sec. 32, that it had no funds in its treasury to pay the warrants authorized by the act (sec-

tion 224A), and it could in no case secure such fund by direct levy until the beginning of the ensuing fiscal year. It would seem therefore that the necessity for complying with the requirements of the Act of 1937 did create a deficiency in the city treasury.

The direction to the special board to purchase the machines, and to the comptroller of Baltimore City to pay for them, is explicit and mandatory, and imposed upon the Mayor and City Council of Baltimore the correlative duty of levying and collecting a tax upon the assessable property of Baltimore City sufficient to furnish a fund to pay the warrants drawn by the comptroller for the purchase of the machines, Baltimore City Charter (Ed. 1927) sec. 6, subsec. 28, as required by the act, section 224A. The duty of providing a fund to purchase the machines came into existence upon the passage of the act.

The only possible methods of providing such a fund would be by an appropriation or diversion of current funds, by a temporary loan, if there are no current funds available, or from the proceeds of a funded debt. If the cost of the machines can be regarded as a mere administration expense, it must be paid by the levy of direct taxes, either to pay for them when the purchase price becomes payable, or to pay the temporary loan, when it becomes due.

A temporary loan to meet a deficiency in the city treasury can only mean a loan to meet some casual and unforeseeable expense resulting from the ordinary administration of the city's business, or some shortage in funds for immediate needs resulting from delay in the payment of taxes, or debts due the city, or from some other like cause. Nor would the term of such a loan be longer than the period intervening between the date of its negotiation and the date on which funds would be available to pay it, either from the collection of new taxes or the collection of taxes already levied.

But it appears from an examination of the ordinance that its purpose is to authorize a funded debt payable

at some indefinite time in the future, so that the power to create such a debt is not conferred by the authority to borrow money "temporarily" to meet a deficiency in the city treasury, but must be found, if at all, in the provision that the Mayor and City Council may "borrow any amount at any time to provide for any emergency arising from the necessity of maintaining the police, or preserving the health, safety and sanitary condition of the city." Whether that provision may be invoked to support the ordinance depends first upon whether the word "temporarily" occurring in the preceding clause is to be regarded as qualifying the language last quoted.

The clause in which the word "temporarily" occurs is, except for the fact that its subject, the Mayor and City Council, is the same, independent of the clause which provides that the Mayor and City Council may borrow money to provide for any emergency arising from the necessity of maintaining the police, of preserving the safety of the city, and would not ordinarily be regarded as qualifying that privilege. That construction is confirmed when consideration is given to the city's possible needs, and the necessities of the case. It is always possible that some catastrophe or emergency may require the immediate expenditure of a sum of money too great to be met from current taxes without practical confiscation, and unless, in such a case, the city had the power to make loans to meet the emergency, the whole purpose of government might fail. In such a case it would seem not only desirable but necessary that the city have the power to negotiate loans, and to spread their payment over a period extensive enough to avoid needlessly oppressive taxation. The privilege of borrowing money to provide for such an emergency as the section defines is not therefore qualified by the word "temporarily," but that word relates only to loans made to meet a deficiency in the city treasury.

The question then is whether the obligation to immediately install voting machines in Baltimore City for use at future elections is an emergency arising from the

necessity of maintaining the police, or providing for the safety of the city.

Without repeating what has already been stated, it may nevertheless be added that the term "maintaining the police," as used in that section, applies not only to police officers or other agents employed to administer and enforce the laws existing for the protection of the public, but also to the measures themselves adopted for that purpose.

While in colloquial speech "the police" is ordinarily understood as applying only to the uniformed constabulary, that is but one of its meanings. In the *Oxford Dictionary* it is said to mean, variously, "policy," "civil organization," "the regulation, discipline and control of a community; civil administration; enforcement of law; public order." "The department of government which is concerned with the maintenance of public order and safety, and the enforcement of the law: the extent of its functions varying greatly in different countries and at different periods," so that "maintaining the police" may be accepted as referring to any system of laws and regulations found necessary for preserving the public safety, and to the enforcement of such laws.

As unregulated elections have long been recognized as a highly dangerous menace to the public safety, the duty of maintaining the police must include the duty of regulating public elections. And that furnishes an additional reason for the construction that the power to borrow money to meet emergencies includes the power to borrow money to adequately safeguard and regulate public elections without submitting the propriety of such regulation to the delays and hazards of a popular referendum, which may turn one way or another according to the public attention to the question, the number voting, the effectiveness of organizations favoring or opposed to the measure, or the political exigencies of the occasion.

But the power can only be exercised if there is an emergency. Whether an emergency exists is a question of fact. Primarily a legislative finding is sufficient but,

except where the power to determine the question is specifically granted, as in article 16, section 2 (*Culp v. Commrs. of Chestertown, supra*), by no means conclusive proof that an emergency exists. *People ex rel. Durham Realty Corporation v. La Fetra,* 230 N. Y. 429, 130 N. E. 601. Such a finding is, however, always entitled to great weight and will not be set aside or annulled unless it clearly and unmistakably appears that it is erroneous. *Ibid.*

Coming then to the fact, there is no proof, other than the mere conclusion of the pleader in this case, to overcome the legislative finding that the necessity for the immediate use of voting machines in Baltimore City is an emergency within the meaning of article 11, section 7, Md. Const. The basis for that finding is that the machines will be beneficial to the public, that they will be more economical than the use of paper ballots, they will afford secrecy in voting, prevent the spoiling of ballots, and insure an accurate count of the votes cast. An examination of the act indicates that fewer officials will be needed as a result of their use, and that the result of the election can be quickly known. All of these advantages, if they exist, must be beneficial to the public, and in the absence of any evidence to the contrary it must be assumed that they do exist. Nor can it be said with certainty sufficient to justify the annulment of the legislative finding, that the need for securing those benefits for the public does not create an emergency within the meaning of the provision last cited, which deals with emergencies in the administration of the city government. And at a time when taxes are, as a matter of common knowledge, not only high but rising, the need for economy may itself, without doing too great violence to the word, be considered an emergency. Moreover, the finding of the City Council that an emergency exists in that city arising from the necessity of policing and providing for the orderly conduct of elections to be held in that city after January 1st, 1938, and the necessity of securing funds to comply with the legislative mandate, tends to

support the legislative finding of an emergency. Delegates representing every political subdivision of the state, as well as delegates representing in its legislative body the City of Baltimore, have united in the finding of such an emergency, and the conclusion resulting from their independent deliberations should not be set aside except upon convincing evidence that their findings are erroneous. The truth of the allegations of fact in the bill would furnish no such evidence, and the legislative finding will not therefore be disturbed.

Another objection is that the ordinance does not require that the debt be discharged within forty years. Assuming that that proviso is applicable, (article 11, section 7, Md. Const.), it does not affect the validity of the ordinance, which delegates to the commissioners of finance of the City of Baltimore the duty and discretion of determining the term, manner, form, and amount of the loan and the interest payable thereon. Ordinance 694, sec. 3. The commissioners of finance are a regularly constituted agency of the city government (Baltimore City Charter [Ed. 1927], sec. 41), and the delegation of such authority to it was recognized in *Douty v. Baltimore,* 155 Md. 125, 135, 141 A. 499, *Bond v. Baltimore,* 118 Md. 159, 84 A. 258, and *Stanley v. Baltimore,* 146 Md. 277, 126 A. 151, 130 A. 181, as valid and lawful. It does not appear that the commissioners of finance have actually issued any obligations or certificates of indebtedness, nor that they have fixed the term of any obligations or certificates to be issued. It is not to be assumed that when they do, they will issue them in violation of that provision of the Constitution which requires that such debts shall be discharged within forty years. On the contrary, the presumption is that that body will faithfully perform its duties.

Another objection to the act is that making the use of voting machines mandatory in Baltimore City, and optional in other parts of the state, is an unreasonable classification, and an unlawful discrimination against Baltimore City. But there is little merit

in that contention. The difference between the conditions prevailing in a congested center of population, and the needs arising from those conditions, and those of sparsely settled rural sections of the state, is too obvious to require comment. Regulations which are not only tolerable but absolutely essential to the preservation of health and safety in a city where vast numbers of persons are massed in a small area, where the slightest unusual incident gathers a crowd, where the momentary standing of a vehicle may cause a traffic jam, and where no man can conduct his business, manage his property, or his personal affairs without considering the effect of his conduct on others, would be burdensome, needless, and oppressive in the wide spaces of the open country. The very congestion of population of itself and without more is a sufficient reason for the classification.

Finding no error in the decree from which this appeal was taken, it must be affirmed.

*Decree affirmed, with costs.*