COHEN *v.* GOVERNOR OF MARYLAND ET AL.

[No. 120 (Adv.), September Term, 1969.]

*Per Curiam Order June 30, 1969.*

*Opinion Filed July 18, 1969.*

6

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Elizabeth M. Eckhardt* for appellant.

*Robert F. Sweeney, Deputy Attorney General,* with whom were *Francis B. Burch, Attorney General,* and

*Henry R. Lord, Assistant Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

In this appeal, Stanley Cohen, the plaintiff below and appellant here, has challenged the constitutionality of Chapter 76 of the Laws of Maryland, 1969, which purported to provide for a "general election" on November 4, 1969 at which time all amendments to the Maryland Constitution proposed by the General Assembly of Maryland at its 1969 Session were to be submitted for adoption or rejection.

Because of the public importance of the case, the Court issued its Per Curiam Order on June 30, 1969 for reasons to be given in an opinion to be filed later, in which it indicated that the Court "is firmly persuaded that the direction of Section 1 of Article XIV of the Constitution of Maryland that a constitutional amendment proposed by the Legislature be submitted to the qualified voters of the State for adoption or rejection at 'the next ensuing General Election' is not gratified by submission of the constitutional amendments proposed by the Legislature at the 1969 Session to the voters of the State at an election called for that special purpose only for November 4, 1969 by Ch. 76 of the Laws of Maryland of 1969" and reversed the Order of the Circuit Court of Baltimore City dated June 3, 1969 dismissing the Bill of Complaint, with costs and we issued the mandate forthwith. Our reasons for our opinion follow.

The General Assembly passed eight proposed constitutional amendments, with the required three-fifths vote in both Houses, for submission to the voters of Maryland for adoption or rejection. These amendments may be briefly summarized for the purpose of this appeal as follows:

1. House Bill No. 13, passed the House of Delegates on March 4, 1969 and the Senate on March 20th. It became Chapter 784 of the Laws of 1969. It provided for a lower period of residency for residents of the State and

8

election district for voting with special provisions for residence requirements for Presidential elections.

2. House Bill No. 913, passed the House on March 14th and the Senate on March 21st. It became Chapter 785 of the Laws of 1969. It would fix the size of the two Houses of the General Assembly, establish standards for districting the State and for redistricting and reapportionment on a regular basis.

3. House Bill No. 914, passed the House on March 11th and the Senate on March 20th. It became Chapter 786 of the Laws of 1969. It would establish an alternate procedure for any county to submit to the voters of that county the question of adopting or rejecting a charter form of government.

4. Senate Bill No. 442, passed the Senate on March 25th and the House on the same day, March 25th, the last day of the 1969 legislative session. It became Chapter 787 of the Laws of 1969. It would establish the office of Lieutenant Governor for the State and would adopt procedure generally relating to his appointment, qualifications and election, as well as for gubernatorial succession and impeachment. Section 1 of this Act contained the following provisions amending Article II, Section 2 of the Maryland Constitution:

> "An election for Governor and Lieutenant Governor, under this Constitution, shall be held on the Tuesday next after the first Monday of November, in the year nineteen hundred and seventy IF THIS AMENDMENT IS ADOPTED IN THE YEAR NINETEEN HUNDRED AND SIXTY-NINE; OR, FOR GOVERNOR IN THE YEAR NINETEEN HUNDRED AND SEVENTY AND JOINTLY FOR GOVERNOR AND LIEUTENANT GOVERNOR IN NINETEEN HUNDRED AND SEVENTY-FOUR IF THIS AMENDMENT IS ADOPTED IN THE YEAR NINETEEN HUNDRED AND SEVENTY, and on the same day and month in

every fourth year thereafter, at the places of voting for Delegates to the General Assembly; * * *" (The portion of Sec. 2 in capital letters was added by amendment after the introduction of the original bill.)

5. Senate Bill No. 481, passed the Senate on March 25th and the House on the same day, March 25th. It became Chapter 788 of the Laws of 1969. It would permit sessions of the General Assembly to extend to 90 days, with an additional possible 30-day extension by a three-fifth vote of each House, would establish the General Assembly Compensation Commission and would provide for the convening of extraordinary sessions of the General Assembly by the Governor.

6. Senate Bill No. 524, passed the Senate on March 17th and the House on March 24th. It became Chapter 789 of the Laws of 1969. It would increase the size and powers as well as alter the procedures of the Commission on Judicial Disabilities; it would create a District Court for the State which would replace the trial magistrates, the justices of the peace and various People's Courts of the State; and it provided that no member of the General Assembly at which the amendment was passed or at which the number or salary of any such judges may have been increased or decreased should be ineligible for appointment as a judge of the District Court because of membership in the General Assembly.

7. Senate Bill No. 526, passed the Senate on March 14th and the House on March 20th. It became Chapter 790 of the Laws of 1969. It would authorize the Governor to make changes in the Executive Branch of the State Government by certain specific measures and would set forth the legal status of such reorganizations when made in conformity with those specific methods.

8. Senate Bill No. 581, passed the Senate on March 17th and the House on March 21st. It became Chapter 791 of the Laws of 1969. It would empower the Governor, with the advice and consent of the Senate, to ap-

point all trial and appellate judges of the State; would establish procedures for hearings and confirmation or rejection by the Senate; would establish a term of 15 years for each judge so appointed and confirmed at the end of which term the Governor would reappoint the judge, subject to approval or rejection by the Senate; and would increase the powers and alter the procedures of the Commission on Judicial Disabilities.

Section 2 of Chapter 784 (House Bill No. 13) is different from Section 2 of the other seven proposed constitutional amendments. Section 2 in Chapter 784 provides as follows:

"SEC. 2. *And be it further enacted,* that the aforegoing section hereby proposed as an amendment to the Constitution of Maryland, at the next general election to be held in this State *in November 1970,* shall be submitted to the legal and qualified voters thereof for their adoption or rejection in pursuance of directions contained in Article XIV of the Constitution of this State, and at the said general election, the vote on the said proposed amendment to the Constitution shall be by ballot, and upon each ballot there shall be printed the words 'For the Constitutional Amendment' and 'Against the Constitutional Amendment' as now prescribed by law, and, immediately after said election, all returns shall be made to the Governor of the vote for and against said proposed amendment, as directed by said Article XIV of the Constitution, and further proceedings had in accordance with said Article XIV." (Emphasis supplied.)

In all of the remaining seven constitutional amendments Sec. 2 *does not* contain the words and figures, "in November 1970", but is otherwise identical to Section 2 in Chapter 784. In these remaining seven proposed amendments the language is that:

"The foregoing sections hereby proposed as amendments to the Constitution of Maryland, at the next ensuing general election to be held in this State, shall be submitted * * *" etc.

Chapter 76 of the Laws of 1969, principally under attack in this case, was House Bill No. 853. It passed the House on March 12th, the Senate on March 20th, was returned to the House on March 21st and was signed by the Governor on April 9, 1969. It provides as follows:

"AN ACT providing for a general election on November 4, 1969, at which shall be submitted for adoption or rejection all amendments to the Maryland Constitution proposed by the General Assembly in its 1969 session, and relating generally to this election.

"SECTION 1. *Be it enacted by the General Assembly of Maryland,* that the following provisions with respect to the holding of a general election on November 4, 1969, at which shall be submitted for adoption or rejection all amendments to the Constitution of Maryland proposed by the General Assembly in its 1969 session, be, and are, hereby adopted.

"1. A general election shall be held on Tuesday, November 4, 1969 at which shall be submitted to the qualified voters of the State for adoption or rejection all amendments to the Constitution of Maryland proposed by the General Assembly during its 1969 legislative session.

"2. Funds as appropriated by law shall pay the cost of this election and the Constitutional provisions and laws of this State relating to referenda for Constitutional Amendments shall govern this election.

"SECTION 2. *And be it further enacted,* that this Act is hereby declared to be an emergency measure and necessary for the immediate pres-

ervation of the public health and safety, and having been passed by a yea and nay vote supported by three-fifths of all the members elected to each of the two houses of the General Assembly, the same shall take effect from the date of its passage."

The appellant Cohen filed his bill of complaint attacking the constitutionality of Chapter 76 in the Circuit Court of Baltimore City on April 22, 1969, as a taxpayer, both on his own behalf and on behalf of those similarly situated. After reciting his status as a taxpayer and that the suit was a class suit, he identified the defendants (appellees in this Court) as Blair Lee III, Secretary of State of Maryland who under the provisions of Code (1957), Art. 33, Sec. 16-6, was required to prepare and certify the form in which a constitutional amendment or rejection should appear on the ballots; the Board of Supervisors of Elections of Baltimore City (identifying its three members by name and position on the Board), reciting that the Board had the legal duty to conduct elections in Baltimore City and Marvin Mandel, Governor of Maryland, whose duty it is by the Article XIV of the Maryland Constitution to order the publication of the bills proposing amendments in various newspapers and after the vote is taken, to issue a proclamation that the amendments approved have been adopted by the people of Maryland as a part of the Maryland Constitution.

After describing the provisions of Chapter 76 as well as the provisions of the eight proposed constitutional amendments already mentioned and summarized, the appellant Cohen alleged that it was estimated that the election called for November 4, 1969 would cost approximately $800,000 and that this expenditure "would constitute a waste and misapplication of funds of the taxpayers of the State of Maryland; * * *".

The prayers for relief were as follows:

1. For a declaratory judgment declaring Chapter 76 either constitutional or unconstitutional.

2. For a declaratory judgment determining and declaring separately which of the eight proposed constitutional amendments are "constitutionally or unconstitutionally matters to be put before the Electorate under Article XVI, Section 2 of the Maryland Constitution."

3. For an injunction (a) restraining the respective defendants from spending, diverting for use or otherwise using the money of the State for publishing the proposed amendments, from preparing and certifying the form in which they should appear on the ballot, from conducting the proposed election in the Counties and in Baltimore City and from proclaiming and declaring that any amendment or amendments are adopted as a part of the Constitution of Maryland; and (b) "from placing before the Electorate each and every proposed amendment which Constitutionally could not be placed before the Electorate under Article XVI, Section 2 of the Maryland Constitution, such as are prohibited from being passed by the Legislature as an Emergency."

4. For other and further relief.

The defendants filed an answer, substantially admitting the well-pleaded facts, including the estimated $800,-000.00 expenditure, denying the inferences, and praying that the Bill of Complaint be dismissed with prejudice.

After argument and a consideration of the trial briefs of the respective parties, the Chancellor (Carter, J.) passed an Order on June 3, 1969 dismissing the bill of complaint, with prejudice, denying the relief sought in the bill of complaint and imposing costs on the plaintiff Cohen. On June 9, 1969, the Chancellor filed a written opinion giving the reasons for his order which in effect was a declaration that Chapter 76 was constitutional and valid and provided for a general election at which the eight proposed constitutional amendments could be submitted to the electorate on November 4, 1969. A timely appeal was taken to the Court from this Order of June 3, 1969.

Two questions were briefed and argued before us:

1. Was the election proposed in Chapter 76 for No-

vember 4, 1969, at which the voters of Maryland would be called upon to adopt or reject the eight proposed constitutional amendments the "next ensuing general election" as meant and required by Article XIV, Section 1 of the Maryland Constitution?

2. Is Chapter 76 also unconstitutional under Article XVI, Section 2 of the Maryland Constitution because it was passed as an emergency measure?

We have concluded that the Chancellor erred in holding that the "general election" provided for in Chapter 76 was the "next ensuing general election" as meant and defined by Article XIV, Section 1 of the Maryland Constitution and we shall reverse the Order of June 3, 1969 for this reason. In our opinion, it is not necessary for us to consider or pass upon the second question presented to us.

Article XIV, entitled "Amendments to the Constitution" provides in relevant part as follows:

> "The General Assembly may propose Amendments to this Constitution; provided that each Amendment shall be embraced in a separate bill, embodying the Article or Section, as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the Journals with the proposed Amendment. The bill or bills proposing amendment or amendments shall be published by order of the Governor, in at least two newspapers, in each County, where so many may be published, and where not more than one may be published, then in that newspaper, and in three newspapers published in the City of Baltimore, once a week for four weeks immediately preceding *the next ensuing general election, at which the proposed amendment or amendments shall be submitted,* in a form to be prescribed by the General Assembly, to the qualified voters of the State for

adoption or rejection. The votes cast for and against said proposed amendment or amendments, severally, shall be returned to the Governor, in the manner prescribed in other cases, and if it shall appear to the Governor that a majority of the votes cast at said election on said amendment or amendments, severally, were cast in favor thereof, the Governor shall, by his proclamation, declare the said amendment or amendments having received said majority of votes, to have been adopted by the people of Maryland as part of the Constitution thereof, and thenceforth said amendment or amendments shall be part of the said Constitution. When two or more amendments shall be submitted in manner aforesaid, to the voters of this State at the same election, they shall be so submitted as that each amendment shall be voted on separately." (Emphasis supplied.)

"Section 2. *Constitutional conventions.* It shall be the duty of the General Assembly to provide by law for taking, *at the general election* to be *held in the year nineteen hundred and seventy,* and every twenty years thereafter, the sense of the People in regard to calling a Convention for altering this Constitution; * * *" (Emphasis supplied.)

As originally adopted in the Constitution of 1867, Section 2 contained the words "eighteen hundred and eighty-seven". The words "nineteen hundred and seventy" were added by amendment by the Acts of 1956, Chapter 99, ratified by the electorate at the general election of 1956.

Inasmuch as the submission of constitutional amendments is controlled by the terms and provisions of Article XIV of the Maryland Constitution, the primary obligation upon us is to discern the intention of those who drafted this Article. As our predecessors stated in *Buchholtz v. Hill,* 178 Md. 280, 285-86, 13 A. 2d 348, 351 (1940):

"The Maryland Constitution was carefully written and solemnly adopted by the Constitutional Convention of 1867, and approved by the people of the state; we should therefore be careful not to depart from the plain language of the instrument."

This intention is primarily discovered by considering the words used by the draftsmen, and these words are deemed to have been used in their ordinarily and generally accepted meaning.

In *Norris v. Mayor and City Council of Baltimore*, 172 Md. 667, 676, 192 A. 531, 535 (1937), Judge Offutt, for the Court, stated:

"Since constitutions are the basic and organic law, and are meant to be known and understood by all the people, the words used should be given the meaning which would be given to them in common and ordinary usage by the average man in interpreting them in relation to every day affairs."

When the language used is clear and unambiguous, there is no need to use extrinsic aids to ascertain the meaning of the language. As was stated in *Reed v. McKeldin*, 207 Md. 553, 560-61, 115 A. 2d 281, 285 (1955):

"It is a cardinal rule of construction that where the text of a constitutional provision is not ambiguous, the Court, in construing it, is not at liberty to search for its meaning beyond the Constitution itself. If the text is ambiguous, the Court should first endeavor to ascertain its meaning from other parts of the instrument. It is not until the means of solution afforded by the entire Constitution have been exhausted without success that the Court is justified in calling outside facts or considerations to its aid."

In considering the usual and generally accepted meaning of the words "general election", we find that these words are defined in *Webster's New International Dictionary* (2nd Edition 1934) as follows:

> "General Election—an election in which every constituency chooses a representative."

This definition indicates that a "general election" is concerned with the state-wide election of representatives of the people and is "general" both in the sense of *scope* and in the sense of the principal *purpose* of elections, i.e. the selection of representatives of the people by ballot. A "general election" is to be contrasted with a "special election" which may be limited as to "scope", as, for example, when *local* officials in a *particular* political subdivision are elected, or as to "purpose", when for example, an issue or issues are presented to the electorate, or to a "primary election" which may be state-wide in scope, but which involves only the selection of candidates of particular political parties or independent candidates for presentation to the electorate at the next general election.

Other definitions include the requirement that a "general election" *regularly recurs at fixed intervals* without any other requirements than the lapse of time.

In *Black's Law Dictionary* (4th Ed. 1951) a "general election" is defined, in part, as follows:

> "One at which the officers to be elected are such as belong to the *general* government,—that is, the general and central political organization of the whole state; as distinguished from an election for a particular locality only. Also, one held for the selection of an officer after the expiration of the full term of the former officer; * * *"

A "special election" is defined, in part, as:

> "An election for a particular emergency; out of the regular course; * * * In determining

whether an election is special or general, regard must be had to the subject-matter as well as the date of the election, and, if an election occurs throughout the state uniformly by direct operation of law, it is a "general election";
\* \* \*"

See also 25 Am. Jur. 2d "Elections", Sec. 3 (1966), and 29 C.J.S. "Elections", Sec. 1 (2) and (3) (1965).

The General Assembly, itself, is entirely aware of these generally accepted distinctions. In the Act of 1967, Chapter 392, by which the State election laws were generally revised, Sec. 1, which contained the definition of words and phrases used in the Act, defined "General election" as meaning "that election held on the first Tuesday after the first Monday in the month of November, at which the *voters* of the *State vote for candidates for President* of the United States *or Governor* and in Baltimore City, this means—the municipal election for Mayor held on the Tuesday next after the first Monday in November in any year in which a municipal election is to be held in the city." (Emphasis supplied.)

In defining the word "election" in the same section, it is provided that the word shall include "all elections, primary, *general, special,* local, Congressional, Presidential or state-wide." (Emphasis supplied.)

Not only did the draftsmen of Section 1 of Article XIV use the words "general election" in their usual and ordinary meaning as above set forth, but in Section 2 of the same Article they demonstrated clearly the type of election they meant by the term "general election". Section 2 made it the duty of the General Assembly to take the sense of the people in regard to calling a constitutional convention at the "general election" to be held in the year 1887 and every twenty years thereafter. The general election of 1887 was an election for state-wide officials. Section 2 was amended by the Act of 1956, Chapter 99 which was approved at the general election of November 6, 1956 so that the year 1970 was substituted for 1887.

As amended, the sense of the people in regard to calling a constitutional convention shall be taken "at the general election to be held in the year nineteen hundred and seventy", at which State officials, including the Governor, will be elected. In short, the provision of Section 2, both as originally drawn and as amended in 1956, indicates that the words "general election" in Section 1 of Article XIV are used in the usual and ordinary sense of those words.

In 1922, Article XVII, providing for Quadrennial Elections was added to the Maryland Constitution by the Acts of 1922, Chapter 227, ratified at the general election of November 7, 1922. As this established a four year term for various state and county officials, Section 2 of the Amendment provided that "Elections by qualified voters for State and county officers shall be held on the Tuesday next after the first Monday of November in the year nineteen hundred and twenty-six, and on the same day in every fourth year thereafter." Section 11 of the Amendment declared the purpose of the Amendment was "to reduce the number of elections, by providing that all State and county elections shall be held only in every fourth year, and at the time now provided by law for holding congressional elections; . . ." Section 13 of the Amendment repealed or abrogated all other provisions of the Constitution inconsistent with it to the extent of such inconsistency. In construing this Amendment, our predecessors, in *County Commissioners for Montgomery County v. Supervisors of Elections,* 192 Md. 196, 211-12, 63 A. 2d 735, 742 (1949) stated:

> "Our interpretation of the Quadrennial Elections Amendment in light of the Home Rule Amendment and the other provisions of the Constitution, impels us to the clear conclusion that the Quadrennial Elections Amendment was designed for, and its effect is limited to, the establishment of a system to regulate *general elections* for the purpose of selecting officers after

> the expiration of the full terms of former officers." (Emphasis supplied.)

It thus appears that we have indicated that "general elections" are those regularly scheduled for the purpose of selecting officers by the electoral process.

In *Mackin v. State,* 62 Md. 244 (1884), it was pointed out that a general election, as required for the submission of a local option issue, might be one at which members of the House of Delegates are elected or one at which both members of Congress and judges are elected throughout the State.[1] In either case, however, it is an election at which State or national officers are elected on a state-wide basis. There was no suggestion that the submission of an issue apart from the election of officers could be a "general election." See also *Downs v. State,* 78 Md. 128, 26 A. 1005 (1893).

It seems apparent to us that an "election" for the sole purpose of the submission of issues to the electorate is a "special election", as the above definitions indicate. The General Assembly, itself, in previous legislation has indicated this. For example, in the Act of 1966, Chapter 501, entitled "An Act to provide for taking at a *special election* to be held at the same time as the primary election in the year 1966, the sense of the voters of this State on the call of a Convention to frame a new Constitution of Maryland, which Convention would be convened within twelve months of that election," (emphasis supplied),[2] the General Assembly in submitting the issue to the electorate in regard to calling a constitutional convention referred to the election, in both the title and body of the Act as a "special election". Again, the Act of 1967, Chapter 4, Section 15, provided that "The proposed constitu-

---

1. The *Mackin* case was decided before the Quadrennial Elections Amendment of 1922.

2. This Court held in *Board of Supervisors of Elections for Anne Arundel County v. Attorney General,* 246 Md. 417, 229 A. 2d 388 (1967) that this taking of the sense of the people by action of the General Assembly was not pursuant to Section 2 of Article XIV of the Constitution and there was no requirement that it be taken at the general election of 1970.

tion [the one prepared by the Constitutional Convention] shall be submitted to the qualified voters of the State for adoption or rejection at a *special referendum election* to be held on May 14, 1968." (Emphasis supplied.)

The Act of 1967, Chapter 4, Section 15 precisely describes the *type* of election involved where an issue or issues are submitted to the electorate, apart from the election of candidates at a general election. It is a *"special referendum election"* and not a "general election". There is no difference in the *type* of election when an entire constitution is submitted for adoption or rejection or when amendments to a constitution are similarly referred for adoption or rejection. It is clear, of course, that referring to a special election as a "general" election does not make it a "general" election. This type of election is established by what function it performs not by *what it is called*. The mandatory provision of Article XIV that amendments be submitted at the next ensuing general election cannot be circumvented by merely calling a special election a "general" election. If the law were otherwise, constitutional limitations would be frail indeed.

In our opinion, the words "general election" used in Article XIV, Section 1 are clear and unambiguous, and have the ordinary and generally accepted meaning we have indicated. These words are mandatory. As was stated in *Hillman v. Stockett,* 183 Md. 641, 649, 39 A. 2d 803, 806 (1944) :

> "We think it is a correct statement of the law that the provisions of the Constitution as to its own amendment are mandatory upon the Legislature, and that if they are not followed, a proposal not in conformity with them should not be submitted to the voters."

The election provided for by Chapter 76 is not a "general election" under the meaning of the constitutional language, but is a "special election" at which constitu-

tional amendments may not be submitted for adoption or rejection by the electorate. It is therefore unconstitutional and void as being in conflict with the provisions of the fundamental law. We regret the necessity of holding an Act of the General Assembly unconstitutional, but our duty is plain when such an act violates the mandatory provisions of the Constitution. As Judge Delaplaine stated for the Court, in *Johnson v. Duke,* 180 Md. 434, 442, 24 A. 2d 304, 308 (1942) :

> "It is the sacred duty of the courts to preserve inviolate the integrity of the Constitution. Hence it would be a violation of their duty to treat the fundamental law as subject to modification except in conformance with constitutional methods."

If we were to assume, arguendo, that the language "general election" in Article XIV, Sec. 1 were ambiguous, the use of the usual aids of construction would lead us to the same conclusion.

As we have indicated, the other provisions of the Constitution strongly suggest that our construction is the correct one. The particularization of the "general election" of 1970 in Sec. 2 of Article XIV is quite significant. Our construction of the words is consistent with the Quadrennial Election Amendment with its stated purpose of *fewer* elections, with a consequent saving of substantial sums of money by the State and of unnecessary expenditures of time, attention and money by the citizens of Maryland.

Of significance also has been the long, continuous and uniform construction of the meaning of the language by the General Assembly itself. As Judge Offutt stated, for the Court, in *Norris v. Mayor & City Council of Baltimore, supra:*

> "In aid of an inquiry into the true meaning of the language used, [in a constitution] weight may also be given to long continued contempo-

raneous construction by officials charged with the administration of the government, *and especially by the Legislature.*" (Emphasis supplied.) (172 Md. at 667, 192 A. 531 at 535.)

See also *Johnson v. Duke, supra,* 180 Md. at 442, 24 A. 2d at 307-08.

During the years 1867, when the Constitution was adopted through 1968,—a span of 101 years—there were 149 statutes of the General Assembly submitting amendments to that document to the electorate for approval or rejection pursuant to Article XIV, Section 1.[3] The first Act to present an amendment was the Act of 1874, Chapter 364 and the last Act to present an amendment before the amendments now at issue was the Act of 1968, Chapter 617.[4] Without exception during this entire period, the proposed amendments have been presented to the electorate at a "general election"—usually specifically designated as to year—as we have construed that language. This uniform and unvarying usage by the General Assembly, itself, is entitled to substantial weight by us if aids to construction were needed. It is of added significance that after the addition in 1922 of the Quadrennial Election Amendment, there were fewer general elections than there were before the adoption of that amendment and hence there was a longer period between general

---

3. These Acts from the Act of 1874, Chapter 364 to the Act of 1966, Chapter 489 are listed at pages 583 to 591 of the Constitutional Revision Study Documents of the Constitutional Convention Commission of Maryland, June 15, 1968.

4. Sec. 2 of the Act of 1968, Chapter 617 provides that it should be submitted to the voters "at the next general election to be held in this State in the year 1968", but at the end of Sec. 2 has the following interesting provision:

"But if the proposed new Constitution of Maryland is ratified by the voters of the State at the *special referendum election* on May 14, 1968, the Act shall be null and void and the amendments to the pre-existing Constitution proposed by the Act shall not be submitted to the voters at the general election in the month of November, 1968" (Emphasis supplied.) It would be difficult to find a clearer distinction by the General Assembly, itself, between a "special referendum election", on the one hand, and a "general election" on the other. .

elections at which proposed constitutional amendments could be submitted for adoption or rejection.

Then too, the approval by the electorate at the general election held on November 7, 1944 of the amendment to Section 1 of Article XIV, itself, substituted by the Act of 1943, Chapter 476 in regard to the advertisement or publication of amendments,[5] but without changing the words "shall be submitted at the next ensuing general election" in the light of the uniform and continuous legislative practice is, in effect, an approval by electorate of this legislative practice. *Cf. Smolin v. First Fidelity Savings and Loan Ass'n, Inc.,* 238 Md. 386, 393, 209 A. 2d 546, 549 (1965) ; *Mahoney v. Board of Supervisors of Elections,* 205 Md. 380, 387, 109 A. 2d 110, 114 (1954).

Moreover, the General Assembly in Sec. 2 of Chapter 784 of the Acts of 1969 (House Bill No. 13) specifically provided that this proposed amendment should be submitted "at the next general election to be held in this State *in November 1970", in pursuance of directions contained in Article XIV* of the Constitution of this State * * *" (emphasis supplied) again indicating that the General Assembly was well aware of when the "next ensuing general election" would be held in the State.

It may be added that in an opinion dated June 12, 1947 by Honorable Hall Hammond, the Attorney General of Maryland, and now Chief Judge of this Court, to the Board of Supervisors of Elections of Baltimore City, 32 Opp. Atty. Gen. 165, the basic distinction between a "general" and "special" election was explored, the prior Maryland cases reviewed, other authorities cited, and the opinion was expressed that the Supervisors of Elections of Baltimore City were not required to prepare a complete and official registration list for each precinct 29 days prior to the special election held on July 15, 1947, that election not being a general election within the meaning

---

5. Eliminating the requirement that the proposed amendment be published in newspapers in Baltimore City in the German Language and changing the time of publication prior to the next ensuing general election from three months to four weeks.

of the Acts of 1945 Chapter 934 requiring preparation of such lists 29 days before every general election.

The cases from other States are of little specific help because of the difference in the language of the applicable constitutional provisions. The weight of authority, however, appears to support our construction of the words "general election" and a "special election". See *Norton v. Letton*, 271 Ky. 353, 111 S.W.2d 1053, 1055 (1937), in which the Court of Appeals of Kentucky stated, quoting from 9 R.C.L. 978, § 3:

> " 'Any election which is not regularly held for the election of officers or for some other purpose which shall come before citizens at regular fixed intervals is a special election'; whilst general elections are those held up on fixed dates for the choosing of officers for regular periods of time and at which voters may exercise their choice by casting their ballots."

See also *Grant v. Payne*, 60 Nev. 250, 107 P. 2d 307, 132 A.L.R. 568 (1940); *Initiative Petition No. 249*, 203 Okla. 438, 222 P. 2d 1032 (1950); *State ex rel. Rowe v. Kehoe*, 49 Mont. 582, 144 P. 162 (1914); *Bolin v. Superior Court*, 85 Ariz. 131, 333 P. 2d 295 (1958); *State ex rel. Nelson v. Superior Court*, 189 Wash. 254, 64 P. 2d 1019 (1937).

But see *Territory v. Ricordati*, 18 N. M. 10, 132 P. 1139 (1913); *State ex rel. Diederichs v. State Highway Comm.*, 89 Mont. 205, 296 P. 1033 (1931) and *Bethune v. Funk*, 85 Ore. 246, 166 P. 931 (1917) in which the opinions indicated that there need be no election of officers to have a "general election".

The appellees rely on *Advisory Opinion in re General Election*, 244 N. C. 748, 93 S.E.2d 853 (1956) and on *Aycock v. State ex rel. Boykin*, 184 Ga. 709, 193 S. E. 580 (1937). In our opinion this reliance is misplaced. In *Advisory Opinion, supra,* the Chief Justice and Associate Justices of the Supreme Court of North Carolina

gave an advisory opinion to the Governor of that State, as provided for in the North Carolina Constitution, that certain amendments to the Constitution of North Carolina proposed at a special Session of the Legislature could lawfully be presented to the electorate of North Carolina at an election prior to the regularly scheduled election to be held in November 1956. The opinion of the Justices was as follows:

> "The undersigned, each for himself, answers the question posed in the affirmative: Provided, such election is held in conformity with the general election laws. See Opinions of the Justices, 204 N. C. 806, *et seq.* and 207 N. C. 879, *et seq.*"

Section 2 of Article XIII of the North Carolina Constitution provides that amendments to that Constitution "shall be submitted at the next general election * * * *in such manner as may be prescribed by law.*" (Emphasis supplied.) The portions of the constitutional provision in italics does not appear in the Maryland Constitution, and *Advisory Opinion* is distinguishable for that reason from the present case. Then too, on examination of the two prior Advisory Opinions relied on by the Supreme Court of North Carolina were concerned with the calling of a Constitutional Convention to ratify or reject the Amendment to the Constitution of the United States repealing the Eighteenth Amendment to that Constitution. The situation was different in those cases and, in our opinion, distinguish the prior Advisory Opinion from the one relied on by the Appellees. And see the dissenting opinion of Justice Clarkson at 207 N. C. 880, 181 S. E. 557, indicating that even under the broad and permissive language of Sec. 2 of Art. XIII of the North Carolina Constitution merely calling a "special election" a "general election" did not make it so. We do not find *Advisory Opinion, supra,* persuasive.

In *Aycock,* the Georgia Constitution like the Maryland Constitution requires that constitutional amendments be

submitted to the people at the next "general election". The Legislature of Georgia by the Act of February 24, 1937 created a state-wide general election to be known as the June General Election, "which shall be held biennially on Tuesday after the first Monday in June, beginning on the above date in 1937, which election shall be held in the same manner, with the same formality, and in accordance with all rules and regulations in existence in holding the November general election." Section 2 of the Act provided that all vacancies of all State and County offices which occurred since the last preceding general election should be filled at the June general election, but could be filled at a special election under the Georgia Code if more expedient and the public interest required the filling of the vacancy at an earlier date than the June general election. Section 3 provided that all amendments to the Constitution and all referenda of Acts should be submitted at the June general election provided sufficient time existed to advertise them prior to the June general election. It can readily be seen that the newly created June general election, recurred at established intervals in the future and that officials were elected at such an election if a vacancy had occurred subsequent to the preceding general election. This type of election fits comfortably within the usual definition of a general election, and in our opinion, *Aycock* is distinguishable from the instant case.

Finally, it seems clear that the consideration of proposed constitutional amendments under Section 1 of Article XIV does not, in itself, constitute a "general election", as such consideration by the electorate is submitted to "the next ensuing general election, *at which* the proposed amendment or amendments shall be submitted * * *". (Emphasis supplied.) In other words, the submission of the amendments for adoption or rejection does not constitute a "general election" but the submission is *at* the next ensuing general election, which is one as ordinarily and usually defined.

For all of the reasons above set forth, it is our opin-

ion that the Chancellor erred in holding that the election for November 4, 1969 provided for in Chapter 76 was a general election within the meaning of Article XIV, Sec. 1 of the Maryland Constitution at which proposed Amendments to the Maryland Constitution should be submitted for adoption or rejection.