29 A.3d 267

Charles G. BERNSTEIN

v.

STATE of Maryland, et al.

Misc. No. 1, Sept. Term, 2010.

Court of Appeals of Maryland.

Sept. 22, 2011.

Cyril V. Smith (A. Paul Pineau of Zuckerman Spaeder LLP, Baltimore, MD; Andrew Jay Graham of Kramon & Graham, P.A., Baltimore, MD; Michael Schatzow of Venable LLP, Baltimore, MD), on brief, for Appellant.

William F. Brockman, Deputy Solicitor General (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BELL, C.J.

## I.

Charles G. Bernstein, the appellant, was appointed on October 10, 2006, by Governor Robert L. Ehrlich, as an associate judge of the Circuit Court for Baltimore City. As required by Article IV, § 3 of the Maryland Constitution, Judge Bernstein stood for election and, on November 4, 2008, was elected for a fifteen-year term of office as an elected circuit court judge. Nevertheless, just over a year into his term, on December 29, 2009, the date of his seventieth birthday, Judge Bernstein was required to retire as a result of that same section of the Maryland Constitution.

Prior to his retirement, on November 3, 2009, Judge Bernstein filed a complaint in the United States District Court for the District of Maryland, challenging his mandatory retirement and naming the State of Maryland, Governor Martin O'Malley, and the Maryland General Assembly as defendants. His argument was, and is, that Article IV, § 3 has application only to judges who "attain" the age of seventy while they are in office and, thus, interpreting it as prescribing a mandatory retirement age for all Maryland circuit court judges, as well as

for those persons who might aspire to be a circuit court judge, violates the rights he has been guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Noting that there is no Maryland case which provides a "definitive interpretation" of Article IV, § 3, the federal district court certified to this Court the following questions:

"1. Does the Maryland Constitution (i) require a sitting judge to retire upon reaching seventy, (ii) prohibit the Governor from appointing a person seventy or older to the bench, and (iii) prohibit a person seventy or older from running for a judicial office?"

"2. Conversely, does the Maryland Constitution permit individuals seventy or older to run for a judicial office and, if elected, to serve out their entire terms?"

## II.

At the center of this controversy is Article IV, § 3 of the Maryland Constitution. It provides:

"Except for the Judges of the District Court, the Judges of the several Courts other than the Court of Appeals or any intermediate courts of appeal shall, subject to the provisions of Section 5 of this Article of the Constitution, be elected in Baltimore City and in each county, by the qualified voters of the city and of each county, respectively, all of the said Judges to be elected at the general election to be held on the Tuesday after the first Monday in November, as now provided for in the Constitution. Each of the said Judges shall hold his office for the term of fifteen years from the time of his election, and until his successor is elected and qualified, or until he shall have attained the age of seventy years, whichever may first happen, and be re-eligible thereto until he shall have attained the age of seventy years, and not after."

Md. CONST. art. IV, § 3. Judge Bernstein views this provision, particularly the second sentence, which he considers the relevant portion, as being "crystal clear" and dispositive of any

question pertaining to the retirement of circuit court judges. Thus, he asserts, the "meaning of the [constitutional] provisions [related to the retirement age for judges] can be gleaned from the text of § 3 alone." Judge Bernstein reads § 3 as clearly and unambiguously requiring retirement only in the case of circuit court judges who "attain" the age of seventy while in office. It follows, therefore, he submits, that a person seventy years of age or older, not currently serving as a circuit court judge, may be appointed to fill a judicial vacancy or, should he or she choose, run for judicial office. Because, he continues, there is no rational basis for the distinction, § 3 fails to comport with the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

Judge Bernstein maintains that his interpretation of § 3 is confirmed by reference to other provisions of the Maryland Constitution. He directs our attention to Article IV, § 2, for example, which prescribes the qualifications for judicial service. Section 2 enumerates those qualifications, as follows:

"The Judges of all of the said Courts shall be citizens of the State of Maryland, and qualified voters under this Constitution, and shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, in the city, county, district, judicial circuit, intermediate appellate judicial circuit or appellate judicial circuit for which they may be, respectively, elected or appointed. They shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge."

Md. CONST. art. IV, § 2. Noting that this provision prescribes a minimum age for judicial service, but not a maximum one, he proffers that formulation as further justification for his interpretation and evidence that the Constitution does not preclude all seventy-plus year olds from seeking judicial office for the first time. He argues, if there were a universally-applicable age limit on judicial service, "one would expect to find it in

[Article IV,] § 2, because that section unambiguously lays out the requirements for judicial service."

The State also views Article IV, § 3 as clear and unambiguous; however, its interpretation produces a result diametrically opposite that espoused by the appellant. Unlike Judge Bernstein, it contends that the section not only clearly precludes a judge from continuing in office, but it does not permit anyone from being elected or appointed to judicial office after he or she "shall have attained the age of seventy." This follows, the State submits, since, grammatically, "shall have attained" is phrased in the future perfect tense, *i.e.* the phrase "refer[s] to a past time within a future period," [1] and, thus, reflects an intent to include all people of, and over, age seventy, not just those who have yet to turn seventy. Therefore, because Article IV, § 3 provides for the expiration of a judge's term at the end of fifteen years or when the judge attains the age of seventy, "whichever may first happen," the State points out that, read logically, the section would require that the term of a judge appointed or elected after the age of seventy would end before it began. The State concludes that Article IV, section 3 simply does not support the appellant's construction.

The State accuses Judge Bernstein of reading Article IV, § 3 without regard to its context. It also contends that his reading of Article IV, § 3 is the result of a hyper-technical textual analysis that should not be allowed to defeat the obvious intent of the Legislature, which proposed the provision, and the citizens, who adopted it by ratifying the Maryland Constitution. Moreover, the State contends that Judge Bernstein implicitly and improperly inserts into Article IV, § 3, the phrase, "while in office," following the phrase, "shall have attained the age of seventy years." The State believes this point to be of particular significance since, at one time, § 3 did include that phrase. Until 1932, it provided:

---

1. *See* Sidney Greenbaum, *The Oxford English Grammar* at 260 (2006); *id.* at 274; *see also* John E. Warriner, *Warriners English Grammar and Composition: Fourth Course,* at 163–64 (1977).

"Each of the said judges shall hold office for the term of fifteen years from the time of his election, and until his successor is elected and qualified, or until he shall have attained the age of seventy years, whichever may first happen, and be re-eligible thereto until he shall have attained the age of seventy years, and not after; but in the case of any judge who shall attain the age of seventy years *whilst in office,* such judge may be continued in office by the General Assembly for such further time as they may think fit, not to exceed the term for which he was elected."

Md. CONST. art. IV, § 3 (amended 1932) (emphasis added). The phrase was amended out of the Constitution in 1932. 1931 Laws of Md., ch. 479 (ratified Nov. 8, 1932).

The State argues, in addition, that Article IV, § 3 is part of a constitutional scheme and, thus, must be interpreted in context, as a part of that scheme. So doing, it asserts, supports its interpretation of the section. The State notes, in particular, Article IV, § 5, which provides:

"Upon every occurrence or recurrence of a vacancy through death, resignation, removal, disqualification by reason of age or otherwise, or expiration of the term of fifteen years of any judge of a circuit court, or creation of the office of any such judge, or in any other way, the Governor shall appoint a person duly qualified to fill said office, who shall hold the same until the election and qualification of his successor. His successor shall be elected at the first biennial general election for Representatives in Congress after the expiration of the term of fifteen years (if the vacancy occurred in that way) or the first such general election after one year after the occurrence of the vacancy in any other way than through expiration of such term. Except in case of reappointment of a judge upon expiration of his term of fifteen years, no person shall be appointed who will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time when his successor would have been elected."

Md. CONST. art. IV, § 5, by its terms, expressly prevents the governor from appointing a person whose seventieth birthday precedes the next judicial election.

It is also of significance to the State that its interpretation of Article IV, § 3, which it characterizes as the plain, ordinary and common understanding of the provision, has prevailed since the provision was adopted, no judge over the age of seventy having been appointed, or elected, to judicial office during the period.

■ "Generally speaking, the same rules that are applicable to the construction of statutory language are employed in interpreting constitutional verbiage." *Brown v. Brown*, 287 Md. 273, 277, 412 A.2d 396, 398 (1980). *See also Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 81 (2004) ("When interpreting constitutional provisions, we generally employ the same rules of construction that are applicable to the construction of statutory language."); *Fish Market Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 8, 650 A.2d 705, 708 (1994) ("Generally, we apply the same principles in construing constitutional provisions as we apply in construing statutory provisions."); *New Central Coal Co. v. George's Creek Coal & Iron Co.*, 37 Md. 537, 557 (1873) ("There can be no good reason suggested why this same general principle [for the construction of statutes], so wise and just, should not also apply as a rule of interpretation of the Constitution.").

■ "It is a cardinal rule of construction that where the text of a constitutional provision is not ambiguous, the Court, in construing it, is not at liberty to search for its meaning beyond the Constitution itself." *Reed v. McKeldin*, 207 Md. 553, 560, 115 A.2d 281, 285 (1955). Further, this Court, while conceding that "the Constitution of 1867 does not always possess the consistency that [a textual] argument supposes," *Rasin v. Leaverton*, 181 Md. 91, 96, 28 A.2d 612, 614 (1942), has recognized that "[t]he Maryland Constitution was carefully written and solemnly adopted by the Constitutional Convention of 1867, and approved by the people of the State," *Buchholtz v. Hill*, 178 Md. 280, 285–86, 13 A.2d 348, 351

(1940), and, therefore, has admonished that courts should be careful not to depart from the plain language of the instrument. *Id.* Furthermore, "[o]ne cannot view the Constitution as made up of separate and unrelated parts. The entire Constitution must be regarded as a whole. Each part must be construed, not by itself, but with reference to the whole...." *County Comm'rs for Montgomery County v. Supervisors of Elections*, 192 Md. 196, 208, 63 A.2d 735, 740 (1949); *State v. Jarrett*, 17 Md. 309, 328 (1861) ("[i]n construing a Constitution, it must be taken as a whole, and every part of it, as far as possible, interpreted in reference to the general and prevailing principle.").

### Text

Both the State and Judge Bernstein contend that the language of Article IV, § 3 is clear and unambiguous; however, they do not agree on what that unambiguous meaning is. The disagreement revolves around what it means to "have attained" the age of seventy; and to whom the provision refers when it states "[e]ach of the said judges." We agree that the text of Article IV, § 3 is unambiguous. Moreover, we conclude that, when read in context and with the other provisions of Article IV, it precludes the retention, appointment or election of a person over the age of seventy as a circuit court judge in Maryland.

Judge Bernstein asserts that the language, "[e]ach of the said judges shall hold his office ... until he shall have attained the age of seventy years," in Article IV, § 3 of the Maryland Constitution, is a restriction solely on those circuit court judges reaching the age of seventy while simultaneously holding their judicial office. He argues that, commonly and long held understandings about Article IV, § 3 aside, the plain meaning of the phrase "[e]ach of the said Judges" refers only to presently serving circuit court judges. He bases that argument on the placement of that phrase in § 3 and on his interpretation of the phrase, "shall have attained the age of seventy years," which he asserts refers to a particular age at a singular point in time. Once having "attained" that age, he

submits, from that point forward a person cannot continually "have attained" that age. This interpretation, while creative, is incorrect.

Judge Bernstein acknowledges that the plain-meaning approach cannot be used to ascribe an unreasonable and absurd meaning to text, but he contends that this limitation is extremely circumscribed. In oral argument, he conceded that it would be inappropriate to read Article III, § 30 of the Maryland Constitution, which mandates that "[e]very Law shall be ... certified under the Great Seal," to require that a large sea mammal be affixed to a duly made law. Judge Bernstein encourages this Court to compare his construction of Article IV, § 3 to the seal example. He contends that his suggested reading of Article IV, § 3 does not pose the same problem because he presents a plausible constitutional scenario.

Although, Judge Bernstein's reading of Article IV, § 3 certainly does not rise to the level of absurdity that the seal example does, his logic, when applied to closer cases, can reasonably be questioned. Among the qualifications found in Article IV, § 2, for example, is the requirement that judicial candidates "be selected from those who have been admitted to practice law in this State." Applying Judge Bernstein's approach and logic, a technically plausible, yet legally incorrect, plain-language reading of the section could be that judicial candidates need not *currently* be admitted to the Maryland Bar. Although this clause is commonly read to require that certain judicial offices be filled by current members of the Maryland Bar,[2] its text, as a matter of language completely

---

2. Contrastingly, it is well established, that while having been admitted to practice law in this State is a requirement for selection as a judge, Md. CONST. art. IV, § 2, it is "not necessary for a judge of an orphans' court to be a member of the bar." *Kadan v. Board of Supervisors of Elections*, 273 Md. 406, 407, 329 A.2d 702, 702 (1974). Md. CONST. art. IV, § 40. For decades, being a member of the Maryland Bar, either currently or in the past, was not a requirement for orphans court judges. Recently, however, the General Assembly passed a Constitutional Amendment, requiring judges of the Orphans' Court for Baltimore City to be "admitted to practice law in this State and [be] members in good standing of the Maryland Bar"; the amendment was

removed from context, can be construed to permit disbarred lawyers, who "have been admitted to practice law in Maryland."

Reading Article IV, § 2, which does not employ homonyms to alter the meaning of the text, to permit disbarred judicial candidates to apply and contest for such positions is not altogether implausible: it may be supposed, although not the most logical or conceivable scenario, that the Legislature and the people could have been concerned only that a judge have some legal experience, not that he or she be admitted to the Maryland Bar *at the moment* of his or her appointment or election. Such a construction, while possible if viewed in isolation, defies common sense when viewed in context and in light of the constitutional scheme. As this Court has stated, "results that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning." *State v. Fabritz*, 276 Md. 416, 422, 348 A.2d 275, 279 (1975). "[A]dherence to the meaning of words does not require or permit isolation of words from their context since the meaning of the plainest words in a statute may be controlled by the context...." *Comptroller of Treasury v. Mandel, Lee, Goldstein, Burch Re–Election Committee*, 280 Md. 575, 579, 374 A.2d 1130, 1132 (1977) (internal quotations omitted). Therefore, "[i]n construing statutes, results that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning." *Id.*, 280 Md. at 579–580, 374 A.2d at 1132; *see also, Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987).

---

ratified by the electorate soon after. Article IV, § 40, cl. (b) (ratified Nov. 2, 2010).

Article I, section 1, clause 1 of the United States Constitution presents a similar challenge to Judge Bernstein's analysis. It provides, in relevant part:

"No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and *been* seven Years a Citizen of the United States, and who shall not, *when elected,* be an Inhabitant of that State in which he shall be chosen."

U.S. CONST. art. I, § 1, cl. 1 (emphasis added). Employing an analysis akin to that which Judge Bernstein uses in interpreting Article IV, § 3, it could be argued, and as plausibly, that the plain language of the clause does not require that a sitting member of the U.S. House of Representatives currently be either a citizen of the United States or an inhabitant of the state that he or she represents. Furthermore, following Judge Bernstein's argument that it is irrelevant that a judge over the age of seventy has not been appointed or elected in Maryland since the adoption of the 1851 Constitution, we should ignore a two-century practice of only electing United States citizens to the U.S. House of Representatives when determining the meaning of this clause.

These are but two examples that demonstrate the dangers and absurdity of interpreting text in a complete vacuum.

Judge Bernstein wants this Court to interpret Article IV, § 3 as prescribing only a retirement age for every sitting circuit court judge. This is not the case. The phrase, "[e]ach of the said judges", in § 3, does not refer to specific persons who are judges, but rather, viewing this phrase in context, references an entire category of judges, meaning all those who are, or who will seek to become members of this category. This is clear when reviewing the prior language in the section. The "said judges" are, as stated in the first sentence of § 3, all judges "[e]xcept for Judges of the District Court, the Judges of the several Courts other than the Court of Appeals or any intermediate courts of appeal." In excluding to whom the section was to be applied, the framers set out what categories of judges were not to be affected, and there is no reason to

believe that they deviated from this path, within the same section, when prohibiting service after the age of seventy. Therefore, the prohibition on judicial service after the age of seventy cannot be exclusively a retirement age, because the section does not apply solely to judges already invested. The provision prescribes a maximum age requirement on the entire category of circuit court judges, which is determinative of an individual's eligibility to serve.

Against the notion of a maximum age, Judge Bernstein argues that "[p]articularly relevant is the fact that [Article IV,] § 2 imposes a mandatory *minimum* age, but no *maximum* age limitation." He contends that if the framers intended to set a maximum age limit for the entire category of judges, it would have been set forth in § 2, where other eligibility requirements are found. Judge Bernstein cites, however, no support for this contention. This is so, because there is no obligation that all required qualifications for active service as a judge be located within the same section of the Constitution.

Judge Bernstein finds support for his position in a recent Illinois case, *Maddux v. Blagojevich*, 233 Ill.2d 508, 331 Ill. Dec. 749, 911 N.E.2d 979, 989 (2009), in which a divided Illinois Supreme Court held 705 ILCS 55/1 (West 2006), the State's Compulsory Retirement of Judges Act, (hereinafter, "Retirement Act" or "Act"), to be unconstitutional. The Retirement Act, as relevant here, provided,

> "[a] judge is automatically retired at the expiration of the term in which the judge attains the age of 75. Such judge shall conclude all matters pending before him unless the Supreme Court makes other provisions for the disposition of such matters. This Section shall apply to all Supreme Court, appellate, circuit and associate judges."

*Id.* This provision earlier had been construed by an intermediate appellate court "as not barring a 'person over the age of 75[,] and otherwise qualified to serve as a judge from running in a judicial election,'" *Maddux*, 331 Ill.Dec. 749, 911 N.E.2d at 984 (quoting *Anagnost v. Layhe*, 230 Ill.App.3d 540, 172

Ill.Dec. 46, 595 N.E.2d 109, 111 (1992)), although he or she could not seek retention, as would have been possible had he or she been under 75 years of age. *Anagnost,* 172 Ill.Dec. 46, 595 N.E.2d at 111. In arriving at this construction, the court was influenced by the following: section 11 of the Judicial Article of the Illinois Constitution prescribes the eligibility criteria for a judge, none of which is age based,[3] *Maddux,* 331 Ill.Dec. 749, 911 N.E.2d at 989; "the long line of authority which prevents the legislature from adding to the qualifications for judicial office, as specified in section 11 of the judicial article," *id.,* 331 Ill.Dec. 749, 911 N.E.2d at 983–84 (citing *Anagnost,* 172 Ill.Dec. 46, 595 N.E.2d at 110); section 15(a) of the Judicial Article which expressly authorizes the Legislature to prescribe a mandatory retirement age for judges,[4] *id.,* 331 Ill.Dec. 749, 911 N.E.2d at 984; the Legislature's enactment of the Retirement Act using language that "leaves little room for an interpretation that it is applicable to any one other than sitting judges," *Anagnost,* 172 Ill.Dec. 46, 595 N.E.2d at 111, and its determination that there is a difference between an adversarial election and a retention election. *Maddux,* 331 Ill.Dec. 749, 911 N.E.2d at 998.

The Illinois Supreme Court rejected the *Anagnost* construction of the Retirement Act and, accordingly, overruled that decision. *Id.,* 331 Ill.Dec. 749, 911 N.E.2d at 988. Pointing out that the language of the Retirement Act purported "to retire *all* judges" and "that providing for the mandatory retirement of judges was the *only* thing that the General Assembly may do under section 15(a)," *id.,* 331 Ill.Dec. 749, 911 N.E.2d at 985, the court held:

"The *Anagnost* interpretation is not supported by the plain language of the Act and, more problematically, does not

---

**3.** Section 11 of the Judicial Article provides, as relevant:

"No person shall be eligible to be a judge ... unless he is a United States citizen, a licensed attorney-at-law of this State, and a resident of the unit which selects him." Ill. Const. art. VI, § 11.

**4.** Section 15(a) provides that the "General Assembly may provide by law for the retirement of Judges and Associate Judges at a prescribed age." Ill. Const. art. VI, § 15(a).

achieve the constitutional mandate of compulsory judicial retirement contemplated by section 15(a)."

*Id.*, 331 Ill.Dec. 749, 911 N.E.2d at 988.

Having overruled *Anagnost* and determined that the Retirement Act "compels mandatory retirement for all judges at the expiration of the term in which they attain the age of 75," *id.*, thereby giving effect to Act's plain language, the court considered whether that result raised other constitutional problems. *Id.* It held that it did, that the Act "creates an irrational classification that could not, in terms of equal protection, withstand scrutiny under our constitution." *Id.*, 331 Ill.Dec. 749, 911 N.E.2d at 990. It explained:

"[S]ection 11 of the judicial article establishes only three criteria for eligibility to be a judge. These do not include either a minimum or maximum age. As a result, *all* citizens who meet these criteria are eligible to be a candidate for judicial office. The Act would preclude a class of people, former judges who become 75 within their term, from running for vacant judicial seats in open elections. This causes constitutional concerns because other citizens, not in that class, can run in open elections for judicial office."

*Id.*, 331 Ill.Dec. 749, 911 N.E.2d at 989. The court concluded:

"There is no rational basis upon which the legislature can prevent 75–year–old or older *former judges* from running in an election, but not citizens 75 years old or older *who were never judges* when the disqualifying characteristic is age. If the legitimate state interest is to insure a vigorous judiciary, the classification we describe above cannot be deemed rationally related to that purpose. We stress again that if age defines ability (and both the constitutional and legislative history indicate that it was believed that it does), either *all* those 75 years of age or older are unfit or they are not. No presumption of constitutionality could save legislation like this that so blatantly violates equal protection."

*Id.*

Judge Bernstein contends that the language construed by the Illinois court is similar to that contained in Article IV, § 3

of the Maryland Constitution, and that, much like Illinois's Retirement Act, Article IV, § 3 has been misinterpreted.[5] To be sure, the result reached by the *Maddux* court is consistent with the position that the appellant is urging in this case. That and the fact that both this case and *Maddux* involved the construction of certain relevant provisions, constitutional ones here and, in Illinois, a statute authorized by constitutional provision, are the only similarities between *Maddux* and the case *sub judice.* Moreover, their authority and focus being diametrically different, the Illinois statute is in no way analogous to the Maryland Constitution and they certainly are not the same.

---

**5.** It is clear that Judge Bernstein perceives the *Maddux* decision to be, in some sense, a vindication of his analysis of Article IV, § 3. It is not. Indeed, the court's construction of the Retirement Act cuts against Judge Bernstein's approach. Rather than hold, as the intermediate appellate court had done earlier, that the Act applied only to judges who sought retention, the court interpreted the Act expansively, as applying to all judges. To be sure, the court construed the Act as applying only to judges and excluding those who were not, and never had been, a judge. That does not assist the appellant's cause, however. The plain language of the statute, "[a] judge is automatically retired . . .", as the court in *Maddux v. Blagojevich,* 233 Ill.2d 508, 331 Ill.Dec. 749, 911 N.E.2d 979, 985 (2009) and *Anagnost v. Layhe,* 230 Ill.App.3d 540, 172 Ill.Dec. 46, 595 N.E.2d 109, 111 (1992), recognized, left no doubt that it referred only to judges, and it was confirmed by its context and relationship with the constitutional provisions it implemented, section 15(a), and complemented, section 11. As we have seen, the office of the Retirement Act was narrow and carefully focused, and being unable to supplement the eligibility requirements for a judge, it was restricted to defining when a judge mandatorily must retire. That is a far cry from the issue *sub judice.*

The analysis used by the Illinois Court of Appeals in *Anagnost,* drawing a distinction between judges who would seek retention and those who would pursue the contested election route, is reminiscent of, although not identical to, Judge Bernstein's analysis in this case. Unfortunately for Judge Bernstein, that analysis was rejected by *Maddux,* which noted, as we have seen, that the Act applied to all judges, whether seeking retention or engaged in an adversarial election. *Maddux v. Blagojevich,* 233 Ill.2d 508, 331 Ill.Dec. 749, 911 N.E.2d 979, 983 (2009). That analysis, in any event, is not persuasive. As the dissent in *Anagnost* pointed out, whether there is a difference between contested elections and retention elections, a holding that a judge who has reached retirement age, nevertheless, may run in a contested election, as opposed to a retention one, is non-sensical, an absurd result. *Anagnost,* 172 Ill.Dec. 46, 595 N.E.2d at 112 (Jiganti, J., dissenting).

While, in this case, the issue is one of constitutional interpretation, to determine what eligibility criteria a person aspiring to be a circuit court judge must meet,[6] what was interpreted in *Maddux* was a statute, which, although enacted pursuant to constitutional authorization, addressed, not the eligibility criteria for becoming a judge, an issue dealt with in the constitution, but rather, a discrete and narrow issue, the retirement age for judges. In *Maddux,* the issue was not who could become a judge, a question answered by a constitutional provision, but, rather, it was whether, and if so, at what age, must a person who has met those prescribed eligibility criteria and become a judge retire. The resolution of that issue turned on the construction of the constitutionally authorized statute. This was made clear by the Supreme Court of Illinois, as we have seen. *See id.,* 331 Ill.Dec. 749, 911 N.E.2d at 985. That point was reiterated when the court rejected the State's argument that section 15, addressing the retirement age of judges, be read together with sections 11, the eligibility requirements, and 12, pertaining to elections and retention of judges, as "an implicit grant of authority to the legislature to create additional eligibility factors pertaining to age for judges." *Id.,* 331 Ill.Dec. 749, 911 N.E.2d at 990. Responding to that argument, the court explained:

> "To interpret the constitution in the manner suggested by the Attorney General is especially problematic because, as we have stated, the constitution acts as a limitation on the General Assembly's authority. In section 15(a), the drafters gave the legislature the discretion to enact judicial retire-

---

**6.** This is an important point and one that distinguishes this case from *Maddux.* Indeed, in that case, recognizing its importance, the State argued, as summarized by the court:

> "[B]ecause section 15(a) mandates retirement at a certain age, the constitution implicitly authorizes that age to be considered as a kind of *de facto* eligibility criterion with respect to sections 11 and 12. This argument is rooted in the notion that if such implicit authorization is not read into the judicial article, this court would, in effect, be reading out of the constitution section 15(a)'s allowance for mandatory retirement."

*Maddux,* 331 Ill.Dec. 749, 911 N.E.2d at 990.

ment legislation. Section 11 acts as a limitation on the General Assembly to add to the eligibility of citizens to run for judicial office. We cannot, merely because of section 15(a), read into section 11 an additional eligibility criterion that would impair the rights of people who have never been judges to run for judicial office. In other words, section 15(a), which allows only for the General Assembly to exercise discretion over judicial retirement, cannot be considered a grant of authority to the legislature over matters other than judicial retirement. The constitution acknowledges that the General Assembly may provide for the retirement of judges, which it sought to do under the Act."
*Id.,* 331 Ill.Dec. 749, 911 N.E.2d 979 at 991

*Structure*

The construction of a constitutional provision is approached, as we have pointed out, *supra,* much like that of a statute. *See Brown v. Brown,* 287 Md. at 277, 412 A.2d at 398. "When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context." *Whiting– Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302, 783 A.2d 667, 671 (2001); *accord GEICO v. Ins. Comm'r,* 332 Md. 124, 131–32, 630 A.2d 713, 717–18 (1993). Statutes on the same subject are "read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory." *Fitzpatrick,* 366 Md. at 303, 783 A.2d at 670 (quoting *GEICO,* 332 Md. at 132, 630 A.2d at 717).

Reading Article IV, § 3 in the context of other related provisions in the Maryland Constitution provides further evidence that the section prohibits all persons over the age of seventy from holding judicial office. Article IV, § 3 must be read in context with Article IV, § 5. Judge Bernstein does not so interpret Article IV, § 3. His argument largely disregards § 5, primarily resting on the assumption that judicial *qualifications* are solely found in Article IV, § 2. The language of Article IV, § 5, however, proves that to be an inaccurate conclusion.

Article IV, § 5, which addresses the appointment of circuit court judges, after establishing that only "duly qualified" persons may be appointed by the governor, provides, in part, that "no person shall be appointed who will become *disqualified by reason of age* and thereby unable to continue to hold office until the prescribed time when his successor would have been elected." (emphasis added). It is implicit in the language that one can be "disqualified by reason of age", that the age of a candidate seeking appointment is, in fact, a *qualification* for the office. Judge Bernstein concedes that this is true, but states that age is only a qualification for candidates, whom the governor appoints, who are between the ages of sixty-eight and seventy. His argument does not square with an in-context reading of the provisions.

Section 5, by reference, prescribes that those who are not of a certain age are not qualified, *see* § 2 (stating "[Judges] shall be not less than thirty years of age at the time of their election or appointment,") and precludes the governor from appointing persons above a certain age, *see* § 3. To be sure, the section does not specify what the age of disqualification is. To determine what that specific age is, § 5 refers back to Article IV, § 3. This interdependence of § 3, which pertains to the election of circuit court judges, and § 5 of the Article, which pertains to the appointment of those judges, is clear evidence that the age restriction of seventy is an age qualification or eligibility requirement that must be met by all sitting and potential judges.

By reading § 3 in context with § 5, it is obvious that the maximum age in § 3 cannot apply solely to sitting judges, for to do so would render § 5 meaningless. As we have previously stated, § 5 places a prohibition on the governor, prohibiting the governor from appointing a candidate "who will become disqualified by reason of age" prior to the "first biennial general election." An exception to this restriction is provided when reappointing sitting judges. That exception, if read in conjunction with Judge Bernstein's interpretation of Article IV, § 3, excludes the appointment of those between the ages

of sixty-eight and seventy and no one else;[7] it would render Article IV, § 5 a needless and nonsensical prohibition against the Governor appointing a judge who will *become* too young to serve. This is exactly what this court cannot do, however. The Maryland Constitution cannot be read in a manner "that is illogical or incompatible with commonsense." *Fitzpatrick,* 366 Md. at 302, 783 A.2d at 671; *State v. Brantner,* 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000); *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985); *Erwin and Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985).

There is no sensible explanation for why the Legislature and the people of Maryland would exclude *everyone* between the ages of sixty-eight and seventy from being appointed to the bench, yet, allow non-former judges to serve once they are older than seventy. Accepting Judge Bernstein's construction would create an equal protection problem for Article IV, § 5. The distinction between former judges and those without prior judicial experience could presumably be sustained as an admittedly blunt state instrument for bringing new perspectives to the bench. *See, e.g., Third Rep. of the Comm. on the Judiciary Dept.* 46 (August 20, 1966) *in* [1966–67] CONST. Convention Comm'n Reports & Drafts Minutes: Judiciary (1967) (hereinafter, "1966 Convention Judiciary Report") (arguing judicial

---

7. There is confusion over whether the clause prohibits the appointment of judges who will reach age seventy prior to the biennial election that immediately follows their first year in office, *i.e.,* generally those over age sixty-eight, or those who will reach age seventy prior to being able to complete a full fifteen-year term. The practice in the State, and in the case of Judge Bernstein, is to allow for the appointment of judges who cannot complete a full fifteen-year term. At least one lawyer for the State has previously contended that this practice is unconstitutional. *See* Dan Friedman, *The Maryland State Constitution: A Reference Guide* 156–57 (2006). Judge Bernstein contends that the purported confusion over the meaning of Article IV, § 5 renders it impracticable for the analysis of Article IV, § 3. It is unnecessary for this Court to resolve whatever confusion may exist concerning the meaning of Article IV, § 5 at this time because Judge Bernstein's construction of Article IV, § 3 renders either of the State's interpretations of Article IV, § 5 unpalatable.

retirement was meant to ensure the availability of judicial offices for young aspiring judges). There is no analogous interest to explain why a person without judicial experience could not be appointed to the bench between the ages of sixty-eight and seventy under Article IV, § 5, (providing, in part, that *"no person* shall be appointed who will become disqualified by reason of age") (emphasis added), but, under Judge Bernstein's construction, could be appointed the moment he or she turned seventy.

To forward his federal claim that Maryland's mandatory retirement provision is irrational, Judge Bernstein invites us to engage in a plain meaning construction that renders multiple parts of Maryland's constitutional structure for appointing and removing judges nonsensical. We decline this invitation. "So it has been said that a constitution is to be interpreted by the spirit which vivifies, and not b[y] the letter which killeth." *Benson v. State*, 389 Md. 615, 632, 887 A.2d 525, 535 (2005) (quoting *Buchholtz*, 178 Md. at 286, 13 A.2d at 351).

*Intent*

Even if the text of the Article IV, § 3, considered in the context of the constitutional scheme established by Article IV, were ambiguous, Judge Bernstein's construction of the section conflicts with the clearly expressed intent of its framers. It is well settled that, with regard to an ambiguous constitutional provision, determining its purpose, as reflected in the expression of intent of the framers, *Cohen v. Governor of Maryland*, 255 Md. 5, 16, 255 A.2d 320, 325 ("The intention [of a constitutional provision] is primarily discovered by considering the words used by the draftsmen"), is critical, *see Johns Hopkins Univ. v. Williams*, 199 Md. 382, 386–87, 86 A.2d 892, 894–95 (1952), indeed, the first task to be undertaken. *Id.* at 387, 86 A.2d at 894–95. In *Williams*, we stated the rule to be:

"In determining the true meaning of the language used, the courts may consider the mischief at which the provision was aimed, the remedy, the temper and spirit of the people at the time it was framed, the common usage well known to

the people, and the history of the growth or evolution of the particular provision under consideration. * * * In aid of an inquiry into the true meaning of the language used, weight may also be given to long continued contemporaneous construction by officials charged with the administration of the government, and especially by the Legislature."

*Id.* at 386–87, 82 A.2d at 894 (quoting *Norris v. Mayor and City Council of Baltimore,* 172 Md. 667, 675, 676, 192 A. 531, 535 (1937)); *see, e.g., Brown,* 287 Md. at 278, 412 A.2d at 399 (when attempting to discern the intention of the Legislature in proposing a particular constitutional provision, "it is permissible to inquire into the prior state of the law, the previous and contemporary history of the people, the circumstances attending the adoption of the organic law, as well as broad considerations of expediency."); *Luppino v. Gray,* 336 Md. 194, 204 n. 8, 647 A.2d 429, 434 n. 8 (1994) ("One of the sources to which the court may look to discern the framers' purpose in enacting the [constitutional] provision is the proceedings of the constitutional convention"), citing *Reed,* 207 Md. at 561, 115 A.2d at 285; *McMullen v. Shepherd,* 133 Md. 157, 160, 104 A. 424, 425 (1918) ("In construing the Constitution we are to consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it, and one of the useful and most helpful sources is the debates of the Convention"). "Thus, we construe the Constitution's provisions to accomplish in our modern society the purposes for which they were adopted by the drafters," *Benson,* 389 Md. at 633, 887 A.2d at 535, and so that they "will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee." *Williams,* 199 Md. at 386, 86 A.2d at 894.

Accordingly, we turn to the history of Article IV, § 3 "to determine the scope and applicability the framers and the people intended it to have." *Abrams v. Lamone,* 398 Md. 146, 188, 919 A.2d 1223, 1249 (2007). The State argues that Article IV, § 3 prevents any person over the age of seventy from serving as an active circuit court judge. The State's assertion

assumes that the framers of the provision were specifically concerned about the advanced age of judges when drafting the section. Judge Bernstein, although he focuses his arguments upon the plain meaning of the text, implies that the framers had another plausible end in mind when drafting Article IV, § 3. Our review of Maryland's constitutional debates lead us to conclude that Article IV, § 3, considered in context with other provisions of Article IV, was intended to exclude persons over the age of seventy from judicial office, either by appointment or the elective process.

As this Court noted in *Norris*, uncovering the "mischief" that the drafters were seeking to address is an ideal means of determining their intent. 172 Md. at 675, 676, 192 A. at 535. The State judicial department was considered and reviewed at Constitutional Conventions three times in less than two decades in the middle of the nineteenth century before the ratification of Maryland's current Constitution. The debates involving the Judiciary at these Conventions focused primarily upon the relative merits of judicial appointment and life tenure.

The specific language, "a judge ... shall hold his office ... until he shall have attained the age of seventy years ... and be re-eligible thereto until he shall have attained the age of seventy years and not after" first appeared in the Maryland Constitution of 1851. Md. CONST. of 1851 art. IV, § 4. At that time, the provision applied only to judges sitting on the Court of Appeals. Section 4, in its entirety, provided:

"The State shall be divided into four judicial districts: Alleghany, Washington, Frederick, Carroll, Baltimore, and Harford Counties shall compose the first: Montgomery, Howard, Anne Arundel, Calvert, Saint Mary's, Charles and Prince George's the second; Baltimore City the third; and Cecil, Kent, Queen Anne's, Talbot, Caroline, Dorchester, Somerset, and Worcester shall compose the fourth district. And one person from among those learned in the law, having been admitted to practise in this State, and who shall have been a citizen of this State at least five years, and above the age of thirty years at the time of his election, and

a resident of the judicial district, shall be elected from each of said court of appeals, who shall hold his office for the term of ten years from the time of his election, or until he shall have attained the age of seventy years, whichever may first happen, and be reeligible thereto until he shall have attained the age of seventy years, and not after, subject to removal for incompetency, willful neglect of duty, or misbehavior in office, on conviction in a court of law, or by the governor upon the address of the general assembly, two-thirds of the members of each house concurring in such address; and the salary of each of the judges of the court of appeals shall be two thousand five hundred dollars annually, and shall not be increased or diminished during their continuance in office; and no fees or person diminished during their continuance in office; and no fees or perquisites of any kind shall be allowed by law to any of the said judges."

Md. CONST. of 1851 art. IV, § 4. There was no maximum age for circuit court judges. *See* § 8, which provided:

"The State shall be divided into eight judicial circuits in manner and form following, to wit: Saint Mary's, Charles, and Prince George's Counties shall be the first; Anne Arundel, Howard, Calvert, and Montgomery Counties shall be the second; Frederick and Carroll Counties shall be the third; Washington and Alleghany Counties shall be the fourth: Baltimore City shall be the fifth; Baltimore, Harford, and Cecil Counties shall be the sixth; Kent, Queen Anne's, Talbot, and Caroline Counties shall be the seventh; and Dorchester, Somerset, and Worcester Counties shall be the eighth; and there shall be elected, as hereinafter directed, for each of the said judicial circuits, except the fifth, one person from among those learned in the law, having been admitted to practise in this State, and who shall be a citizen of this State at least five years, and above the age of thirty years at the time of his election, and a resident of the judicial circuit, to be judge thereof; the said judges shall be styled circuit judges, and shall respectively hold a term of their courts at least twice in each year, or oftener if required by law, in each county composing their respective

circuits; and the said courts shall be called circuit courts for the county in which they may be held, and shall have and exercise in the several counties of this State all the power, authority, and jurisdiction which the county courts of this State now have and exercise, or which may hereafter be prescribed by law, and the said judges in their respective circuits shall have and exercise all the power, authority, and jurisdiction of the present court of chancery of Maryland: *Provided, nevertheless.* That Baltimore County court may hold its sittings within the limits of the city of Baltimore until provision shall be made by law for the location of a county-seat within the limits of the said county proper, and the erection of a court-house and all other appropriate buildings for the convenient administration of justice in said court."

Md. CONST. of 1851 art. IV, § 4.

The provisions pertaining to Maryland's Judiciary were the culmination of decades of attempted reform, which had been thwarted primarily by fears over a potential reapportionment of the state government that could threaten the interests of Maryland's politically powerful slaveholders. Dan Friedman, *The Maryland State Constitution: A Reference Guide* 5 (2006).[8] In addition to addressing the apportionment of the Legislature, the 1851 Convention sought to democratize the selection of judges to address perceived abuses in the judiciary. *See id.*[9]

---

**8.** The drafters of the 1776 Constitution all hailed from the Eastern Shore or southern Maryland. Dan Friedman, *The Maryland State Constitution: A Reference Guide* 2. The relative growth in the population and wealth of the City of Baltimore, specifically, and the Western Shore, generally, left these regions increasingly underrepresented, from a democratic standpoint, in State government. *Id.* at 4.

**9.** Friedman argues that the troubles with the judiciary were so extensive that delegates from southern Maryland and the Eastern Shore were willing to chance a Convention, although they first secured a guarantee that the Convention's representation would mirror the disproportionate representation that these regions contemporaneously held in the Legislature, and that no steps would be taken to abolish or otherwise undermine the institution of slavery. *Id.* at 4.

The 1851 Constitutional Convention primarily focused on three aspects of the judiciary that would remain constant areas of debate in Maryland's subsequent constitutional history: judicial selection; judicial tenure; and the number of judges, circuit geography, and judiciary salaries. *See* 2 Debates and Proceedings of the Maryland Reform Convention to Revise the State Constitution (1851) (hereinafter "1851 Debates"). The circumstances that led to the adoption of Article IV, § 3 are closely tied to the contemporaneous tensions over judicial selection and tenure. At the opening of the 1851 Convention, Maryland had more than two centuries of experience with appointed judges, with life tenure. The 1851 Convention, coming in the wake of Jacksonian democracy, exhibited the populist fervor of the period. *See, e.g.,* 1851 Debates 460–63. For example, after asserting that the selection of judges was a sovereign power that, having passed from the British monarchy to the people of Maryland, was only delegated to the Governor, Delegate Sam Bowie argued that the people retained the inherent right to select their judges. *See id.* It was a right, he argued, as the spokesperson for the 1851 Convention's Judiciary Committee, that the people were now choosing to exercise because of a growing perception that the appointment privilege was being abused. *See id.* at 463.

Among the abuses noted by Delegate Bowie were the use of judicial office for patronage, and the appointment to "the bench [of] old and infirm men, not fit, either mentally or physically, to perform the duties which the Constitution or the public exigencies require of them." *Id.* Although delegates did not expressly discuss the judicial maximum age restriction in the 1851 Debates, the age limitation was applied to the judges of the Court of Appeals, who had to make the arduous trip to Annapolis each year. This provides some evidence that the restriction was meant to address the selection of "old and infirm men" to the bench.

Delegates to the 1864 Convention were more explicit in making this connection, directly linking the language that appears in Article IV, § 3 of the current Constitution to the need for a hard age limit for judicial service. For example,

arguing in opposition to an amendment limiting the age of judges, Delegate John Thomas stated: "I do not consider that a man in growing old loses his mind, and becomes incapable of being a good judge." *See* Debates of the Constitutional Convention of the State of Maryland 1526 (1864) (hereinafter "1864 Debates"). Although Delegate Thomas opposed the amendment as being unnecessary given the practice of periodic elections, his comment suggests that mental competence was an animating concern for age limits in the 1864 Convention.

Delegate Ezekiel Chambers' responded to Delegate Thomas' comments. His comments demonstrated that opponents of judicial elections also acknowledged concerns about declining judicial competence with advanced age in conjunction with the lengthy tenure for judges. 1864 Debates at 1526–27. Although Delegate Chambers, like Delegate Thomas, did not perceive advanced age to be a hindrance upon a judge's ability to perform his functions, he acknowledged that other delegates were opposed to judges serving beyond the age of sixty. *See id.* Delegate William Bond directly linked the language of Article IV, § 3 to judicial competence in the 1864 Debates when he explained his hesitancy to support an amendment limiting a judge's age to sixty-five, because he believed that men retain their mental and physical ability to seventy years of age perhaps as perfectly as to any other age. *Id.* Whether in opposition to, or in support of, age limits, the delegates at the 1864 Convention, like those at the 1851 Convention, viewed the seventy-year age limit as a means of ensuring judicial competence.

Likewise, the enhanced risks of mental and physical incompetency were given as reasons for the inclusion of Article IV, § 3 in the 1867 Constitution. In defense of his amendment to change the 1867 Judiciary Committee's proposal of life tenure "during good behavior" for judges to the language presently found in the section, Delegate Henry Archer explained that "[t]he life, liberties and property of the people should never be endangered by being placed in the control of a man mentally or physically incompetent." Philip Perlman, Debates of the

Maryland Constitutional Convention of 1867 311 (1923).[10] Delegates at the 1867 Convention, however, acknowledged that setting a hard age limit meant that some capable judges would not be able to serve, so they included a provision in Article IV, § 3 that permitted the Legislature to continue a judge in office after the age of seventy;[11] this decision was also discussed in the context of accounting for physical and mental competencies. *See, e.g.,* id. at 311, 313. For example, Delegate Albert Ritchie, a Maryland judge and father of Governor Albert C. Ritchie, reportedly argued that the baseline age limitation should be retained, because although "the Legislature [should have] the power to retain the services of the judge who was capable ... they were not dealing with the exceptions, but with the rule, and he could not consent that any judge be retained at the sacrifice of the good of the public." *Id.*

At all three Conventions, delegates debated the relative merits of an elected judiciary and lengthy tenure. Throughout these debates, the language of Article IV, § 3 was discussed as a means of keeping the bench free of judges rendered incompetent by advanced age. At no point in any of the three Constitutional Conventions was the language of Article IV, § 3 discussed in the context of ensuring judicial turnover for the sake of harnessing fresh judicial talent or for any purpose other than ensuring that the bench was not populated by people over a certain age. When employing the language found in Article IV, § 3, the intent of the framers of the 1851, 1864, and 1867 Constitutions was to prevent the active service of persons over the age of seventy.[12]

---

**10.** Information about the 1867 account is based on compiled newspaper articles; there is no official record of the 1867 constitutional debate. The newspaper articles align chronologically with the official Convention proceedings.

**11.** This provision would eventually be repealed in 1932, *See* 1931 Laws of Md., ch. 479 (ratified Nov. 8, 1932). Efforts to repeal originated with several legislators who complained about being pressured by judges.

**12.** The amendment to Article IV, § 3, in 1931, to remove the Legislature's ability to continue judges in office after age seventy, 1931 Laws of

*Practice*

Judge Bernstein is correct when he asserts that the lack of a practice is not dispositive of a constitutional issue. Nevertheless, continuing the assumption, *arguendo,* that Article IV, § 3 is ambiguous, it should be remembered that this Court "has ... held that a contemporaneous construction placed upon a particular provision of the Maryland Constitution by the legislature, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period, furnishes a strong presumption that the intention is rightly interpreted." *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 620, 458 A.2d 758, 770 (1983) (citing *Wyatt v. State Roads Commission,* 175 Md. 258, 1 A.2d 619 (1938); *Humphreys v. Walls,* 169 Md. 292, 181 A. 735 (1935); *Trustees of the Catholic Cathedral Church of Baltimore v. Manning,* 72 Md. 116, 19 A. 599 (1890)).

There is no denying that Maryland has a longstanding practice of not permitting judges to remain regular members of the bench after attaining the age of seventy. For better or worse, Maryland has maintained a policy of retiring judges at the age of seventy. That there is such a policy, and the strength of that policy, was demonstrated in the last decade of the 20th century. An amendment to raise the maximum age for all categories of judges from age seventy to age seventy-five, supported by Chief Judge Robert C. Murphy, former chief judge of this Court, and Chief Judge Robert F. Sweeney, former chief judge of the District Court, was proposed in the Legislature in 1994. *See* "Delegates Vote to Increase Age for Judges' Retirement to 75," *The Daily Record,* Mar. 10, 1994 at 1. The amendment called for an increase in the maximum age of active service for "all circuit court, District Court, and appellate court judges in the State," H.B. 1151, Bill Analysis by Senate Judicial Proceedings Committee, and mandated that

---

Md., ch. 479 (ratified Nov. 8, 1932), was unrelated to, and did not undermine, that intent. *See generally* Judges' Terms, *Baltimore Sun,* Jan. 23, 1931, at 8. *See also* Age Limit for Judges, *Baltimore Sun,* Mar 19, 1931, at 10 (reporting claims that legislators and lawyers were often supporting judges out of fear of potential retribution from the bench).

a majority of judges on the Court of Appeals certify annually that each judge over the age of seventy be "physically, mentally, and temperamentally qualified to continue to perform the duties of office." 1994 Laws of Maryland, Ch. 104 § 1. (rejected Nov. 8, 1994). A judge so certified was to be "eligible for reappointment or reelection for an additional term as provided in sections 3, 18B,[13] and 41D [14]" of Article IV. *Id.* The bill, passed by the Legislature, submitted the amendment to the voters pursuant to Article XIV of the State Constitution. In 1995, the Maryland voters rejected this amendment.

The Maryland practice and policy of retiring judges, all judges, at age seventy, has been premised on the perception that it has been a constitutionally mandated aspect of the Maryland judiciary since 1851, albeit then only for judges of the Court of Appeals, and, since 1867, for circuit court judges. The only major change to the relevant portion of Article IV, § 3 was a constitutional amendment, ratified in 1932, that removed an exception to the seventy years of age requirement, thus precluding the Legislature from continuing judges in office after they attained age seventy. 1931 Laws of Md., ch. 479 (ratified Nov. 8, 1932). As the State notes in its brief, the last judge to be retained in office following his seventieth birthday retired in 1934.

The practice with respect to new judges being elected or appointed is even more robust. Since the adoption of the

---

13. Section 18B provides that the continuance in office of a Court of Appeals judge, after the first general election following the end of his elected term, shall be governed by Section 5(c), which states that such a continuance is "subject to approval or rejection by the registered voters of the appellate judicial circuit from which he was appointed at the next general election following the expiration of one year from the date of the occurrence of the vacancy which he was appointed to fill, and at the general election next occurring every ten years thereafter." Md. CONST. art. IV, §§ 5(c), 18B.

14. Section 41D states, in relevant part, that "[i]f the ten year term of a judge shall expire before that judge shall have attained the age of seventy years, that judge shall be reappointed by the Governor, with the Senate's consent, for another ten year term or until he shall have attained the age of seventy years, whichever may first occur." Md. CONST. art. IV, § 41D.

language in Article IV, § 3, no judge in the State has been appointed or elected to the bench following his or her seventieth birthday. These longstanding practices provide further evidence that the intent of the framers of Article IV, § 3 was to ensure that there were no active judges over the age of seventy in Maryland's judiciary.

### Policy

The initial policy arguments for Article IV, § 3 may not be as persuasive today as they were in 1851, 1864 and 1867. As noted above, much of the debate about mandating that judges retire at the age of seventy concentrated upon the effects of individual aging. There was a concern among many of the delegates that the likelihood of physical or mental illness was too substantial and a healthy, active judiciary too important to permit the selection of judges over the age of seventy. Times change. Life expectancy has increased dramatically since the 1867 Convention, and the ease of moving from one locale in the state to another has improved even more over this period. Remarking upon what he perceived to be an antiquated policy, one critic of the decision, made at the 1966 Maryland Constitutional Convention, to retain the seventy age limit, labeled it "constitutionally imposed senility." 1966 Convention Judiciary Report at 46.

For its part, the Judiciary Committee of the 1966 Convention argued that the age limit ensured timely adoption of modernization in judicial administration, in trial techniques, or in the evolution of the law itself because it required older sitting judges to step aside for younger men. *Id.* Although the 1966 Convention resulted in a Constitution that was rejected, it too provides some evidence of the continuity in the perceived policy goal of Article IV, § 3, a Maryland judiciary whose active judges are all under the age of seventy.

### III. Conclusion

The text of Article IV, § 3 is unambiguous, and interpreting it in conjunction with the text and overall structure of related constitutional provisions confirms the State's interpretation of

the section. The intent of the provision's framers, found in the debate records of the 1851, 1864 and 1867 Constitutional Conventions, is consistent with the State's interpretation of the section. Furthermore, longstanding practice and policy rationales all confirm the State's reading of Article IV, § 3. Under Maryland's Constitution, no one, no matter his or her prior judicial history or lack thereof, can be an active member of the Maryland Judiciary once he or she has attained the age of seventy.

In response to the questions certified to this Court, we advise: (1) The Maryland Constitution (i) requires a sitting judge to retire upon reaching age seventy, (ii) prohibits the Governor from appointing a person seventy years of age, or older, to the bench, and (iii) prohibits a person seventy years of age, or older, from running for a judicial office and (2) Conversely, the Maryland Constitution does *not* permit a person seventy years of age, or older, to run for a judicial office and, if elected, to serve out the entire term.

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE–HALF BY THE APPELLEES.